PeR Curiam:
This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on April 26, 1967. On May 25, 1967, the defendant filed a notice of intention to except which was thereafter withdrawn on June 5, 1967. The case comes before the court on plaintiff’s motion to adopt the commissioner’s report and to enter judgment for plaintiff in accordance therewith. Since the court agrees with the commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Buie 47 (c).
OPINION OE COMMISSIONER*
Bernhardt, Commissioner:
Plaintiff, an Army Captain honorably discharged in 1953, sues for physical disability *1139 retirement pay under the Career Compensation Act of 1949,[1] claiming that the Army Board for Correction of Military Records erred in denying his application for a correction of his discharge. I agree with him for reasons which will appear.
Plaintiff enlisted in the Regular Army in 1940 and became a First Sergeant before the age of 21. From the end of November 1944 to February 10, 1945, he was engaged in unremitting combat in Germany, serving in the Ardennes and Rhineland campaigns of World War II, including the Battle of the Bulge. As a young Second Lieutenant he led his infantry platoon for ten weeks against the enemy across rugged terrain under the most arduous combat and weather conditions. He endured much of the wholesale carnage, hazards, gruesome sights, and physical and emotional stress and discomfort which war entails until finally, on February 10,1945, while leading his men to capture an enemy position, he was hit by machinegun bullets which ripped through his chest and emerged near the spine, and fell to the ground coughing blood. He remained where he fell in an exposed position under heavy mortar bombardment for several hours until rescued, sustaining further grievous wounds in his thigh from mortar fragments. (Findings 4, 5.) These were the incidents which precipitated the physical and psychiatric residuals which eventually developed and which bring this liberally decorated veteran here seeking disability retirement pay.
He was extensively hospitalized and treated until December 1945 for his grave injuries (to chest and lungs, ribs, left thigh, right arm, diaphragm, intrapleural adhesions) and psychoneurosis (anxiety, acute, severe, precipitated by combat duty). (Finding 8.) In November 1945 a Disposition Board reported plaintiff’s scar tissue from his chest wounds to be improved, his fractured ribs to be healed, and his acute anxiety state to be improved. At the plaintiff’s wish, the *1140 Board recommended that be be returned to duty in a permanent limited service status confined to tbe United States. (Finding 9.) The Army Retiring Board concurred in the findings and recommendation of the Disposition Board in December 1945, but in February 1946 the Office of the Surgeon General disagreed because of the plaintiff’s improvement and prospect for further improvement. Accordingly, plaintiff was placed on sis months’ temporary limited service subject to later reexamination and reevaluation by the Retiring Board to determine whether he was permanently incapacitated for active service. The Retiring Board was closed and, through some administrative oversight, plaintiff’s case was never reconsidered. Instead, on February 6, 1946, the plaintiff was discharged for nonphysical reasons because no vacancy existed for permanent limited service at the time. (Finding 11.)
The Army was plaintiff’s career by preference. In February 1946 he reenlisted as a First Sergeant, was examined in May 1946 in connection with his request for recall to active duty as an officer, and was found to be not permanently incapacitated for either general or limited service. He was again examined in connection with his discharge as a First Sergeant and found to meet the physical and mental standards for discharge. In September 1946 he was reappointed a First Lieutenant and placed on active duty. The reports of his two physical examinations in 1946 as a First Sergeant do not mention the fact that in late 1945 the Disposition Board and Retiring Board had found plaintiff fit only for limited duty. (Finding 12.)
A physical examination in October 1946 reported plaintiff acceptable for only limited service as an officer due to the injury to his right chest wall, and he remained so classified officially until August 2, 1947, when a Disposition Board reclassified him to general military service with a waiver for scar tissue in the chest. In the interim he had been reevaluated at the Madigan General Hospital upon his complaints that pain from his chest wounds prevented him from doing full general duty in the field, and he was cleared both physically and psychiatrically. (Finding 13.)
From September 1946 to February 1948 plaintiff performed administrative duties in varying assignments at several differ *1141 ent stations in the United States. His efficiency reports during that period were excellent. In January 1949 be sought psychiatric assistance and a change of assignment, complaining of being nervous, bitter, irritable, frustrated, and resentful over failure to be promoted. On July 25, 1949, he was released from active duty at his request purportedly to go into business. He had been examined and found physically qualified for separation. (Finding 18.)
Plaintiff adjusted normally to civilian life after his second discharge, and was employed as a Jewel Tea Company salesman for ten months. In July 1950 he applied for extended active duty (on patriotic representations; the Korean War was on and he apparently felt the Army and he needed each other), and was ordered to active duty in September 1950 after a physical examination which found him physically qualified for extended active duty in general service. At that time he represented to the examining physician that he had never experienced trouble sleeping, or with nightmares, depression, or nervous trouble of any sort, and had no physical defects which would interfere with active duty. The report does not refer to his several previous psychiatric diagnoses. The individual who desires to enter military service can often dissemble or conceal certain types of ailments of a subjective variety which depend for disclosure on his candor. (Finding 14.) Plaintiff was promoted to Captain in July 1951 and secured an extension of his tour to August 31, 1954. (Finding 15.) Until June 1952 he had a series of administrative assignments at Fort Lawton, Washington. Then he was transferred to Japan as security courier transfer officer at the base post office.
At least to July 19,1951, plaintiff’s efficiency reports reflect that he performed his duties well and had admirable qualities as an officer. Then the rot set in. His efficiency reports from October 1951 to June 1953 reflect a marked deterioration in attention to duty, reliability, indolence, drinking, neatness, “chip on the shoulder” attitude, ambition, nervousness and excitability, and thoroughness, although during some reporting periods his performance seemed to improve temporarily. The rating and endorsing officers who made out his efficiency reports indicated variably during most of this period that plaintiff’s performance at the next higher *1142 grade would be fairly adequate, or barely adequate, or inadequate. As of March 1953 he was reported to be in a highly nervous state due to his serious wounds, although neat and physically fit in appearance.
It is significant that during plaintiff’s tour in Japan he was found (at the November 1951 annual physical) physically capable of performing duties commensurate with his rank but was “profiled” as P-3 pursuant to paragraph 10, AR 40-100, C — 1, August 27,1951. Findings 8-11 in Powers v. United States, 176 Ct. Cl. 388 (1966) describe the Army physical profile serial system. The P-3 profile translates that the plaintiff met the requirements for limited military service as prescribed in MR 1-9, but was not physically qualified for general military service. The permanent P-3 profile was confirmed by a Medical Board which met in February 1953 to evaluate plaintiff’s old chest wound. The Medical Board rated plaintiff with a partial permanent disability for military service, recommended him for general service in a fixed installation, and qualified for overseas assignments, despite the fact that paragraph 38, AR 40-105, January 9, 1952, which was applicable at that time, limited acceptability to P-1 and P-2 profiles where the defects concerned the chest wall as in plaintiff’s case. Either the Medical Board’s finding and recommendation were mutually inconsistent and incompatible with the controlling regulations, or the parties have neglected to cite other provisions which research has not brought to light. It cannot be seen how the Medical Board could have recommended plaintiff for even modified general service when he was rated a P-3 profile for defects to the chest wall. At plaintiff’s request for relief from active duty, he was returned to the United States and released from active duty on June 8, 1953, not by reason of physical disability, as a Captain. Hospitalization or an appearance before a Retirement Board was neither requested nor proffered. (Finding 15.)
Immediately prior to his final separation in 1953 plaintiff was again examined. At that time he reported that he had had (was having) soaking night sweats, shortness of breath, pain or pressure in his chest, chronic cough, frequent trouble sleeping, frequent and terrifying nightmares, and nervous trouble. The examiner noted abnormal lung and chest con *1143 ditions, occasional cbest pain on exercise, chronic shortness of breath, and that plaintiff had suffered from an anxiety state in 1947 which was then asymptomatic. Despite these observations and the Medical Board’s rating of a permanent P-3 profile four months earlier, the examiner separated plaintiff with a P-1 profile, and did not recommend a Disposition Board or a Retiring Board inquiry. (Finding 16.) What makes this omission the more remarkable is the considerable evidence which was available by that time in plaintiff’s extensive medical records concerning his physical and psychiatric condition in the service, his attempt to commit suicide in Japan by lying down on a congested highway, spells of depression, violent nightmares usually involving fantasies of fighting the Germans, and irregular sleeping habits. While these episodes were not all contained in plaintiff’s medical records up to that time, it would seem that they could have been ascertained easily by a neuropsychiatric examination of any depth. No such examination was attempted. Certainly such background and symptoms are sufficiently inconsistent with a P-1 profile and a determination of physical qualification for separation to warrant more than a perfunctory physical examination.
Further reflection of plaintiff’s condition at the time of and following his last release in June 1953 is shown in his record of disability compensation from the Veterans Administration. While not binding on the Army in a disability retirement proceeding, the action of the Veterans Administration is entitled to some consideration and weight in determining whether a discharged officer is 30 percent or more disabled under the standards of the Career Compensation Act, supra, n. 1, and section 272 (a) of the Act directs that the percent of disability be “in accordance with the standard schedule of rating disabilities in current use by the Veterans’ Administration * * Thus in October 1953 the VA granted plaintiff disability compensation from June 10, 1953, with a combined disability rating of '50 percent (gunshot wound 30 percent, pleural cavity injury 20 percent, anxiety reaction 10 percent). On July 11,1955, the VA increased the combined disability rating to 60 percent by increasing the previous rating of 10 percent for anxiety reaction to 30 percent. At this time it was pronounced that plaintiff had an acute severe *1144 anxiety reaction with, some schizoid features. In November 1961, the combined disability rating was increased to 70 percent, in March 1963 to 90 percent (including 70 percent rating for anxiety reaction with depressive features), and 100 percent since August 1964 because of unemployability attributable to his condition. If the Veterans Administration could detect that a 50 percent disability existed at the time of plaintiff’s last discharge in June 1953, the failure of the Army separation examiner to reach comparable conclusions with the plaintiff’s voluminous medical record available, must be attributed to a lack of curiosity, skill, or time. It is noted in passing that the VA found plaintiff’s disabilities to have been aggravated by his last tour of service, and that he has had intensive and frequent psychiatric treatment at the VA from 1955 to date in a rehabilitation effort, with unimpressive results and poor prognosis. (Finding 17.)
In September 1953 the plaintiff accepted an appointment as Captain in the Army Reserves, and served two-week tours of active duty in 1954,1955 and 1957. On several occasions during this period he signed routine, formal certifications that he was well and physically qualified for full military duty and that his condition had remained the same since his discharge from active duty in 1953. These certifications were untruthful and conflict with the contemporaneous record of plaintiff’s disabilities. For example, in March 31,1954, he was planning to appeal his disability retirement claim. At that time he was rated 50 percent disabled by the VA since Ms discharge. During 1953 and 1954 he had been unable to hold a civilian job more than briefly due to physical shortcomings and temperamental inability to get along with his employers or customers. In July 1955 the VA increased his disability rating to 60 percent from May 1955. During his active duty tour of two weeks in 1955 a companion officer testified that he visited the plaintiff every day in his quarters because he was obviously ill, slept constantly, was depressed and noncommunicative, did not participate in social or extracurricular activities, and seemed to be in another world. This coincides with the fact that in 1955 plaintiff was receiving intensive psychiatric care at the VA Mental Hygiene Clinic and was then in a state of considerable emotional instability. The report of his periodic medical exam *1145 ination in August 1957 noted (by him) bis several years of soaking sweats, shortness of breath, chest pain due to wounds, depression, loss of memory, nervous trouble, and scars from battle injuries. The examiner reported plaintiff qualified for general military service with a physical profile of P-1, and an efficiency rating officer gave him a glowing report of well-being, character and performance. Considering the contemporaneous evidence to the contrary, including the fact that in 1957 the plaintiff was still on 60 percent disability compensation from the VA, something is clearly amiss in the accuracy of the plaintiff’s medical history in the Eeserves from 1953 to 1957. Corroborating this surmise, in July 1959, plaintiff was involuntarily transferred from the Eeady Ee-serves to the Eetired Eeserves for physical disqualification as reported in his March 1959 physical examination. The record of physical qualification to remain in the Eeserves seems in this case (and many others) to be an unreliable criterion of actual physical condition; there is perhaps too little opportunity for proper evaluation, coupled with a human desire to help a fellow officer remain in the Eeserves by underreporting his condition and overrating his performance. (Finding 18.)
In October and November 1956, and finally in October 1961, the Army Board for Correction of Military Eecords denied plaintiff’s three applications for a correction of his record to reflect a discharge for physical disability. Other than the denial of November 1956, the others were stereotyped formal rejections. The more complete and personalized one of November 1956 was based on a 25-page hearing, plaintiff’s medical records, his AG 201 file, a case summary by an examiner for the Board, plaintiff’s efficiency reports, and — most significantly — at least two advices from the Office of the Surgeon General. Finding 19(b) summarizes the Board’s November 1956 letter of denial. If the Board did not rest its decision exclusively on the adverse advices of the Surgeon General, at least its decision omitted any meaningful discussion of the plaintiff’s complicated and contradictory service and medical records which would reconcile the inconsistencies in the context of applicable regulations so that the applicant would be able to determine the validity of the reasons for the rejection of his application.
*1146 On the justified assumption that the Board’s decision was predicated principally on the advices received from the Surgeon General, those advices are minutely described and the deficiencies listed in finding 19(d) and (e). To say that they were most superficial is an understatement. Apparently the Surgeon General’s adverse conclusion was based primarily on the facts of record that plaintiff had repeatedly been considered as fit for duty and had repeatedly demonstrated his ability to perform his duty in a satisfactory manner. A singular omission in the advices of the Surgeon General is reference to the plaintiff’s psychiatric disabilities, even though the Correction Board had specifically requested further consideration of this ground. It is well to reiterate the views of the court in a comparable situation in Smith v. United States, 168 Ct. Cl. 545 (1964), where, after describing the cursory advice of the Surgeon General on which the Correction Board relied in its decision which was couched in broad conclusions rather than a reasoned discussion of the evidence, the court stated at page 553:
* * * Where the medical issue is complex and in considerable dispute, and the Veterans Administration has previously found service-connection, a disposition of the claim for disability retirement by the Correction Board without a hearing and without an analysis of the evidence in writing is inadequate assurance that due weight was given to all of the evidence, both medical and non-medical, even though the opinion may formally recite that it was based upon all of the evidence.
It is difficult to imagine in the present case, with its overwhelming record of the inception, course and degree of plaintiff’s disabilities, how the Correction Board could have possibly arrived at a decision adverse to the plaintiff’s contentions no matter how thoroughly its decision may have presented, discussed and analyzed the evidence. Thus the chief fault in the decision of the Board was not that it failed to provide plaintiff with a reasoned analysis of the facts pro and con, but that it was manifestly contrary to the evidence.
The cause, diagnosis, and disabling symptoms of plaintiff’s physical and psychiatric condition before, at the time of, and subsequent to the plaintiff’s discharge in 1958 are presented in considerable detail in findings 20, 21 and 22. His wartime *1147 injuries produced physical symptoms of obest pressure and pain, pain in the back and ribs, respiratory difficulties, fatigue, and possible damage to the heart muscles. His psychiatric symptoms were depression, violent dreams and nightmares, night sweats, insomnia, nervousness, tenseness, fears, anxiety, mental impairment, irritability, and somatic complaints. Damages to the musculoskeletal system caused by ■missiles passing through the body are described graphically in the Veterans Administration Schedule for Rating Disabilities. The plaintiff’s condition was the subject of testimony of Dr. MacQuigg (an eminent specialist in thoracic surgery and a member of the Lovelace Clinic of Albuquerque which participates in the examination and selection of astronauts), Dr. Warren T. Brown (formerly head of the psychiatry department at Yale University and consultant to several military and civilian Government agencies), and Dr. S'hauver (a prominent psychiatrist and author of scientific articles in tire field who was a Lieutenant Colonel in the Medical Corps during World War II and connected with the VA for 30 years). All three of these experts knew the plaintiff well and treated him for his condition at various times since the 1953 discharge. Their testimony was not presented to the Correction Board. They left no doubt that plaintiff was disqualified for military service at the time of his discharge in 1953 for both physical and psychiatric reasons. (Finding 24.) The defendant presented two medical experts, a Colonel Sweeney who is Chief of the Psychiatric and Neurologic Service at Walter Reed and consultant to the Surgeon General, and Lieutenant Colonel Aaby, Assistant Chief of the Thoracic Surgery Service at Walter Reed. B'oth expressed the opinion that plaintiff was physically fit for active duty at the time of his discharge in 1953, both from the psychiatric (Sweeney) and the physical (Aaby) standpoints. Neither of the Government medical experts had seen or examined the plaintiff; their testimony was based upon the evidence of record. On cross-examination it appeared that they were unaware of certain vital details in the plaintiff’s medical record. (Finding 24.) Obviously ¡tin© advice from medical experts who are personally familiar with the individual whose condition is under inquiry, and who treated him, is far *1148 preferable to those who did not have that opportunity and who rely on an incomplete knowledge of the written record.
That the plaintiff’s various complaints, or some of them, would disqualify him for active military duty is shown by portions of his military performance record before and after his 1958 discharge, and indirectly as well by his civilian work record after 1953 which has been extremely erratic to the point where the VA currently regards him as unemployable.
The conclusion is that plaintiff was unfit for active military service at the time of his release in June 1953, that his incapacity was incurred in and aggravated by the service, that his percentage of disability was at least 50 percent under the applicable Veterans Administration Schedule for Rating Disabilities, and that the refusal of the Correction Board to correct plaintiff’s record to show such disability was not supported by substantial evidence and was contrary to the clear, convincing and cogent evidence. Plaintiff is entitled to a judgment for his disability retirement pay from his date of release in 1953 in an amount based upon disability of 50 percent.
FINDINGS on Fact
1. Enlisted Service. Plaintiff served as an enlisted man in the Utah National Guard from June 14,1937 to March 24, 1938. On January 24, 1940, he enlisted in the Regular Army. He received several promotions as an enlisted man and became a First Sergeant while still under 21.
2. Commissioned Service in the Z-I. Plaintiff was commissioned a Second Lieutenant on January 13, 1944, after completing a course at Officers’ Candidate School. He transferred from Artillery to Infantry, trained at Fort Benning, and became an Infantry platoon leader. After combat training he trained others in combat techniques. He asked for and was given overseas service.
3. Overseas Service, October 12, lOJl-Afril 23,191¡5.
(a) Plaintiff served in the European Theater from October 12, 1944 to April 23, 1945. By the end of November 1944 he was ordered into combat in Europe, and remained in combat as an Infantry rifle platoon leader until wounded in action in Germany February 10,1945. He was hospitalized *1149 in Europe until April 4, 1945, then returned to the United States for further treatment.
(b)He received the following decorations: Combat Infantry Badge, American Defense Ribbon, American Theater Ribbon, Good Conduct Medal, Victory Medal, three Battle Stars, the Purple Heart and the Bronze Star, given to him “for exemplary conduct in ground combat against the armed enemy.” He was awarded a battlefield promotion to First Lieutenant on February 17,1945.
4. Gombat Experiences.
(a) During his active combat from the end of November 1944 to his wounding on February 10, 1945, plaintiff was subjected and exposed to wartime conditions of great severity. He encountered, observed and experienced human suffering, death and injury of an aggravated nature.
(b) He served in the Ardennes and Rhineland campaigns, including the southern part of the Battle of the Bulge.
(c) The terrain on which plaintiff fought was hilly, forested in part, and dotted with many small villages. The winter was very severe, with heavy snow followed by rain. About half the time plaintiff and his men lived in dug-in holes in the fields, the other half in villages or farmhouses.
(d) Plaintiff encountered the hazards of full-scale battle, including heavy artillery, mortar fire, firing from machine-guns, rifles and tanks, and antipersonnel mines concealed in the fields.
(e) There was constant attrition from death, injuries, and nervous collapses among the men in plaintiff’s platoon. In taking one objective 15 of the 29 men under plaintiff’s command survived the initial assault, with only 5 of the 15 surviving the ensuing artillery and mortar fire from a nearby hill. One of Iris men lay with head shot open, brains extruding. He witnessed his men, and others, killed by enemy fire; one being “cut in half”. His own runner was killed right behind him with a rifle bullet between the eyes. Corpses were commonplace. The day before plaintiff was wounded his men and those nearby were shelled by tanks for hours and a whole platoon of another company was knocked out. Most of his men were hit by snipers. “Shoe mines” concealed' in the fields amputated limbs. He observed among his men uncontrolled crying spells and crackups.
*1150 (f) Plaintiff tried to be a good example to bis men. He led tbem into combat, was often shot at by snipers and others, and, in turn, shot and killed others. Most of his operations consisted of patrolling, searching out the enemy and deliberately trying to draw their fire to learn their location, a difficult and hazardous task because of the fluidity of the battlefield positions and uncertainty of whereabouts. There was danger of being hit by friendly troops because of poor visibility. Many patrols were at night. There was fear that they would not return and that no one would know their fate. One of plaintiff’s night patrols was almost completely destroyed because the men failed to keep far enough apart from one another. In attacks upon half-submerged German concrete pillboxes they used flamethrowers, hand grenades and pole charges, with sometimes grisly results to the occupants.
5j. Plaintiff’s Wounding, February 10,191¡ñ.
(a) Pursuant to orders to take a five-point intersection held by the Germans on the top of a hill, plaintiff led his platoon out of their holes at 4 to 5 a.m., on February 10, 1945. While leading his platoon about 30 to 40 yards from their objective, he felt himself tom along the side and through the chest and back, fell on 'his leg£ and went down coughing blood. The man behind him was killed.
(b) He lay where hit on the road for half an hour under heavy mortar fire. Shell fragments penetrated his left thigh. He was unable to move, but another soldier pulled 'him into the ditch beside the road where they remained for from three to five hours under constant shelling. He was unable to use his left side or right arm. Finally, the aid men arrived and removed him on a stretcher, with blood gushing from his wounds.
(c) Plaintiff had been hit by machinegun bullets which entered the right side of his chest below the armpit, went through the pleural (chest) cavity, and emerged next to his spine. The inner part of his right arm had been injured where the bullet entered his chest. His left posterior thigh had penetrating shell fragment wounds.
(d) Plaintiff was given emergency first aid treatment and was evacuated to the 59th Field Hospital that night.
6. Plaintiffs Emotional Reactions in Combat.
*1151 (a) To lead and serve as an example to bis men, plaintiff restrained bis emotions despite tbe risks, sights, emotional breakdowns of bis men, and duty to kill. His composure broke twice — once wben his runner was killed behind him and be cried, cursed and screamed at his men, and again wben be lost bis temper because bis men hesitated to follow him in attacking a pillbox.
(b) Plaintiff’s personal reaction to combat was constant fear which he bad to conceal and control. The fear and exertion in combat combined to exhaust his energy.
(c) It will be understood that many of the facts reported in findings 4, 5 and 6 above are based on plaintiff’s uncorroborated testimony, with no effective opportunity for refutation by the defendant, but no reason is apparent for disbelieving the plaintiff’s account.
7. Plaintiff’s Hospitalisation„ February 10 to December %8, 191¡5. Plaintiff was hospitalized in Europe, England and the United States from February 10 to December 23,1945.
8. Fundings, Diagnoses and Treatment, February-December 191¡5.
(a) During plaintiff’s hospitalization from February-December 1945 the following physical injuries were found and treated:
(1) Chest and Lungs. Severe, multiple, penetrating gunshot wounds through his right chest pleural cavity and right lower lobe of lung. Blood had gathered in the pleural cavity of his chest (hemothorax). On February 11, 1945, an open thoracotomy was performed to repair the chest wall and de-bride the chest wounds. A catheter was placed in the chest for aspiration, oxygen given for severe intrinsic lung damage, and penicillin and other antibiotics administered. Coarse rhonchi (bronchial rales) were found. He was disoriented and irrational from hyperhyrexia probably from atypical pneumonia combined with battle fatigue.
(2) Ribs. The machinegun bullets and mortar shell fragments had also caused a compound, comminuted, complete fracture of three ribs on the right side, portions of the ribs being removed.
(3) Left Thigh and Right Arm. There were shell fragment wounds in the left posterior thigh, debrided February *1152 11, 1945, and perforating gunshot wounds in the right upper arm.
(4) Diaphragm. In May 1945 plaintiff’s wounds were reported healed. An X-ray of June 29,1945, showed a flattening of the right leaf of the diaphragm and tenting of the left leaf caused by contraction of the pleural scar tissue. This condition was also found in November 1945.
(5) Intrapleural Adhesions. During the final period of hospitalization, a diagnosis of cicatrix (intrapleural ad-hesions), right chest, symptomatic, severe, resulting from bullet wounds penetrating chest, was recorded. Cicatrix and adhesions refer to scar tissue.
(b) During plaintiff’s hospitalization from February-December 1945 the following mental or psychiatric conditions were found and reported in his medical records:
(1) On March 10,1945, a diagnosis of psychoneurosis, anxiety, moderate, was recorded at the 79 th General Hospital in England. On admission to Madigan General Hospital at Fort Lewis, Washington, on May 1, 1945, a diagnosis was made of anxiety state, acute, severe, manifested by nervousness, not based on organic findings. On admission to Mitchell Convalescent Hospital, Camp Lockett, California, on September 24,1945, a diagnosis was made of line of duty anxiety state, acute, severe, precipitated by three months’ arduous combat duty as infantry officer culminating in a battle injury, predisposition none, incapacity mild, recovered.
9. Disposition Board, November 8, 19J¡A. Following his hospitalization, plaintiff appeared before a Disposition Board at Mitchell Convalescent Hospital on November 8, Í 945. The Board made the following diagnoses:
a. Cicatrix, symptomatic, posterior aspect, right chest, result of (b). Improved. LD Yes.
b. Fracture, compound, comminuted, complete 9th, 10th and 11th ribs, right, incurred in action when struck by enemy machine gun fire, 10 Feb. 45, Germany. Healed. LD Yes.
c. Anxiety state, acute, severe, precipitated by three months arduous combat duty as Inf. Officer, culminating in battle injury. Improved. LDYes.
The Board recommended that plaintiff be returned to duty in a permanent limited service status confined to the continental *1153 United States. At tbat time plaintiff certified that he desired to remain on active duty in a permanent limited service status.
10. Army Retiring Board, December SO, 191¡5.
(a) Plaintiff appeared before a Eetiring Board on December 20, 1945. It recommended that plaintiff be returned to duty in a permanent limited service status confined to the continental United States.
(b) The medical witnesses -testified that plaintiff had been twice seen by a psychiatrist during the week preceding the AEB hearing and that he felt it was possible to give plaintiff a clearance for his neuropsychiatric disturbance and to discharge him on the basis of his wounds rather than psychoneurosis. In their medical report, the physicians stated:
Because of the persistent symptoms from his intra-pulmonary adhesions which have been demonstrated on X-ray, it is felt that he should go to permanent limited duty. It is also recommended that he be kept in the Army in accordance with his wishes, but that _ he be transferred to a position in which he is not required to handle large numbers of men.
The conditions were all determined to be incurred in line of duty. The anxiety state was found to be secondary to three months’ arduous duty as an infantry platoon leader, culminating in a battle wound in a nonpredisposed individual.
(c) In response to a Eetiring Board question whether he wished to be relieved from active duty, the plaintiff said:
No, Sir, the army is my career. I am a Eegular Army enlisted man and that is the only way I feel I can make a living.
(d) On November 13, 1945, Mitchell Convalescent Hospital requested the Adjutant General in Washington for certification whether or not a position vacancy in grade existed for the plaintiff in an MOS (military occupational specialty) for which he was qualified, and that his assignment was considered essential under the provisions of Circular No. 313, WD, 1945. The Adjutant General certified that no such vacancy existed.
(e) On February 13,1946, the Office of the Surgeon General expressed its nonconcurrence with the AEB findings, *1154 stating that the record showed improvement and that further improvement might be expected. It recommended that plaintiff be given six months’ temporary limited service with reexamination and reevaluation at the expiration of such time and that the record be returned to the Board for reconsideration. It stated the Board might well find the plaintiff not permanently incapacitated for active service.
(f) On February 21, 1946, in accordance with the recommendation of the Surgeon General, the Adjutant General’s Office returned the AEB proceedings to Mitchell for reconsideration by a reconvened Board. However, the Eetiring Board at Mitchell was closed and reconsideration was never given the plaintiff’s application, although the records were sent to the Surgeon, 9th Service Command, for action. On March 13,1946, the Adjutant General’s Office advised plaintiff that final decision in the case would not be made pending receipt and review of the reconvened Board in the War Department.
11. Plaintiff's Release, February 6,19J/.6. In the meantime, on December 21,1945, an order was issued at Mitchell stating that plaintiff had been found physically qualified for permanent limited service by the AEB, that no vacancy existed, and that he should commence his terminal leave on December 22, 1945, and revert to inactive status on February 6, 1946.
12. Plaintiff's Reenlistment and Reappointment, February-September 191¡.6.
(a) While on terminal leave plaintiff kept after the Adjutant General’s Office and the Eecruiting Office at Salt Lake City to accept him as an enlisted man. He requested a waiver of his physical disability for the purpose of such reenlistment. He succeeded in reenlisting in the Eegular Army on February 19, 1946 as a First Sergeant. Upon reenlistment he withdrew his application filed December 28,1945, with the Veterans Administration for disability compensation.
(b) Upon learning that the Eetiring Board had not reconvened to reconsider its findings (see finding 10 (f), supra), the plaintiff on May 7, 1946, requested recall to active duty as an officer. His request was approved. He was examined on May 28, 1946, and found not permanently incapaci *1155 tated for either general or limited service.[1] He was honorably discharged as a First Sergeant on September 10,1946, after a physical examination in which he was pronounced to meet physical and mental standards for discharge,[1] and on September 11, 1946, he was reappointed a First Lieutenant and assigned to Fort Lewis, Washington, for active duty. He had requested to be listed as a volunteer for overseas service, preferably in the Panama Canal, Antilles, or Caribbean areas.
13. Plaintiff's Service, 19f6-19J¡D.
(a) From September 11,1946 to December 11,1946, plaintiff served on active duty at the Fort Lewis Emplacement Center as platoon leader and assistant adjutant. From January 1,1947 to February 28,1947, he served as personnel control officer. His efficiency ratings for these periods were excellent.
(b) On October 8, 1946, plaintiff was given a physical examination at Fort Lewis, and it was reported that he was acceptable for limited service because of a nonincapacitating defect in his right chest wall, citing AE 40-100, paragraph 7 (3). On October 25,1946, the Commanding General, Sixth Army, recommended to the Adjutant General that plaintiff was physically qualified for active duty, general service, with a waiver of physical defects resulting from his war wounds which were not considered incapacitating. In the report of plaintiff’s annual physical examination on January 22,1947, it is stated that plaintiff was placed on limited service at the time of his recall to active duty, and under date of March 7, 1947, recommended that he was fit for general service with a waiver. There is some inconsistency in this physical examination report. There was no record of action on the recommendation of March 7, 1947, until May 1947 when he was admitted to the Madigan General Hospital for reevaluation and disposition of his permanent limited service status due to pain from his chest wounds which he complained prevented him from doing full general duty in the field. The surgical service at Madigan on June 26, 1947, found plaintiff fit for general service with a waiver for cicatrix of pleu *1156 ral posterior aspect of right chest with residuals of rib fracture, and on July 15, 1947, the neuropsychiatric service cleared bfm psychiatrically. On July 29, 1947, a Disposition Board at Madigan reclassified plaintiff from permanent limited service to general military service with waiver of cicatrix, symptomatic, mild, and he was returned to duty in this status on August 2, 1947. Thus, from the time of his recall to active duty in September 1946, until July 29,1947, the plaintiff was considered to have been on permanent limited service, and on that date reverted to general military service with waiver of physical defect.
(c). Plaintiff’s semiannual efficiency report, covering the period July 1,1947 to February 29,1948, stated that plaintiff was mentally and physically capable, well-grounded in professional knowledge, very good in administration, possessed good military bearing, and was neat in appearance. During that period plaintiff was assistant regimental adjutant. Thereafter plaintiff continued to perform administrative duties as assistant personnel staff officer at Fort Lewis, assistant regimental adjutant for the trial judge advocate at Fort Ord, regimental adjutant at Fort Riley, and assistant regimental adjutant at Fort Riley. He was transferred to duty under his primary MOS 2110 in January 1949 at Fort Riley and felt he had been demoted.
(d) On January 25, 1949, he was interviewed by the Consultation Service at Camp Funston where he sought psychiatric assistance and grounds for a change of assignment. He complained of being nervous, bitter, irritable, frustrated, and resentful over failure to be promoted. An entry dated February 25, 1949 states “Subject officer well adjusted, was sent away to service school some weeks ago.” Plaintiff was assigned to the engineering school at Fort Belvoir from March 7 to June 1949, where he successfully completed the course.
(e) On June 30,1949, plaintiff requested that he be relieved from active duty, citing as reason that he intended to go into business. He was examined on July 20, 1949, and found to be physically qualified for separation. He was released from active duty on July 25,1949.
14. Civilian Work, 194-9-50, cmd Reentry on Active Duty 1950.
*1157 (a) Following bis release from active duty plaintiff worked as a salesman for the Jewel Tea Company for about ten months, earning about $100 per week. He seemed to adjust himself normally to civilian life.
(b) On July 27, 1950, plaintiff applied for extended active duty, certifying that he was physically qualified therefor and that there had been no significant change in his physical condition subsequent to his last relief from active duty on July 25, 1949. He professed to feel strongly concerning the obligation of men to serve their country, and the Korean war had started that summer. He was examined ou August 7,1950, and then stated in a “yes orno” checklist that he had never experienced trouble sleeping, nightmares, depression or nervous trouble of any sort, despite his several previous psychiatric diagnoses. He was found physically qualified for extended active duty in general service, in a specialty or rating 2110, and ordered to active duty on September 14, 1950, in an MOS 2200, assigned to an Army Service Unit at Fort Lawton, Washington.
15. Service History, September 1950-June 1953.
(a) On September 18, 1950, plaintiff certified that he considered himself physically qualified for full military duty, that he had been so found on his physical examination on August 7,1950, that he had no physical defects which would preclude the performance of full military duty. (Note that a Disposition Board in 1953 recorded that plaintiff had been admitted to active duty on September 14,1950, with a waiver, apparently a mistake.)
(b) On July 18, 1951, plaintiff was promoted to Captain, AUS. Although his tour of duty would normally have expired June 13,1952, on August 17,1951, at plaintiff’s request, his tour was extended to August 31,1954.
(c) From May 9, 1951 to June 16, 1952, plaintiff was assigned to Fort Lawton, Washington, in various capacities, including executive officer of the headquarters detachment, commanding officer of a provisional company in a replacement division in charge of billeting enlisted overseas casual replacements, supervisor of BOQ custodial services involving supply activities and reassignment of rotates personnel, and finally in a casual capacity en route to Japan. From June 17, 1952 to August 7, 1952, he was security courier transfer *1158 officer at the base post office in Japan responsible for delivery of security courier material in Japan and elsewhere in the Far East Command. At least through June 1951 plaintiff’s frequent efficiency reports reflect that he performed his administrative duties well and had admirable qualities as an officer. The following comments in his subsequent efficiency reports reflect the ambivalent caliber of his performance and conduct:
July 19,1951: Subject Officer performed duties in an excellent manner while serving with this organization. He is mature in judgment and displayed much ability in solving administrative and disciplinary problems which are inherent in an organization composed of many EM of lengthy service and high rank. Officer expressed himself well and demonstrated his physical, mental and moral fitness. His reassignment to my command would be welcomed. He maintains excellent supply discipline.
October 3,1951: An officer who is morally and physically qualified. Has very satisfactory military bearing and appearance. He is inclined to be careless in attention to duty, requires close supervision. Has average ability to organize a situation. Cool and deliberate in manner. These deficiencies have been discussed with him.
At this time the rating officer certified that plaintiff “usually performs this duty competently”, while the indorsing officer certified that plaintiff was “Barely adequate m performance of this duty.” Both the rating officer and indorsing officer certified that plaintiff “would give an inadequate performance at the next higher grade.”
January £3,1952: While serving under me this officer was capable and efficient. He does a good job. He was amenable although at times assumed a “chip on the shoulder” attitude. Likes free time and alcohol. Not very neat in appearance but physically and professionally qualified. Satisfactory effort in utilization of manpower in an economical manner. * * * This officer is not lacking in ability, but he is undependable and requires close supervision.
At this time the rating officer certified that plaintiff “usually performs this duty competently”, and “would give a fairly adequate performance at the next higher grade”, while the indorsing officer certified that plaintiff was “barely adequate in the performance of this duty” *1159 and “would give an inadequate performance at the next higher grade.”
April 25, 1952: A likeable but loquacious officer, inclined to be blunt at times. Seems to lack ambition although performing assigned duties cheerfully. Satisfactory effort hi utilization of manpower. * * * This officer’s attitude and attention to duty has improved considerably during the period of this report.
The comments of the rating and indorsing officers as to plaintiff’s performance of duty at a higher grade were the same as in the report dated January 23,1952, quoted supra.
August 19,1952 {Japan): From all outward appearances, this officer is physically fit and in good health. This officer has an easy, amiable manner, maintains a neat presence. He is good natured, cheerful, cooperative and security conscious to an outstanding degree. He is conscientious and tries to do a good job. Takes criticism in good spirit and takes immediate corrective action. I consider this officer to be of average intelligence. He is of excellent character and his moral qualities are above question. Exercises maximum supply economy. Nothing notable observed relative to the utilization of manpower under conditions outlined in par 3, Sec. 1, Cir. 94, DA, 21 Nov. 51.
March 6, 195S (Japan): Eated officer is of medium height and build, has a friendly and outgoing personality. He has been seriously wounded and this apparently has left him in a highly nervous state. Although he is neat and physically fit in appearance, he is very excitable and always in a hurry; therefore is not thorough with his operation. He is not too well versed in world affairs nor in military matters. No known moral deficiencies; due to his physical conditions his mental qualities are not the highest. * * * It is difficult to evaluate this officer’s future value to the service inasmuch as his assignment and capabilities are limited at the present time due to his physical profile (3). * * *
The rating and performance officers characterized plaintiff’s performance of duty as “usually performs this duty competently”. The rating officer thought that plaintiff would give a fairly adequate performance at the next higher grade, but the indorsing officer thought such performance would be inadequate.
June 10,1953 (Japan): * * * He has a friendly and outgoing personality but is extremely nervous and gets excited easily. His moral qualities are excellent but due to combat wounds his physical and mental qualities are not the best; lacks thoroughness.
*1160 The comments of the rating and indorsing officers as to plaintiff’s performance of duty and ability to perform duty at a higher grade were the same as in the report dated March 6, 1953, quoted supra.
(d) In an annual physical examination on November 8, 1951, the plaintiff was found physically capable of performing duties commensurate with his rank and experience in his branch of service. He was “profiled” as follows, pursuant to paragraph 10, AE, 40-100, C-l, August 27,1951:
PULHES
3 11111
This profile was confirmed on February 10,1953, by a medical board (see paragraph (g) of this finding, infra, for further details of this board’s findings).
(e) The Physical Profile Serial System in use by the Army as of October 2,1945, is described in finding 10 in Powers v. United States, 176 Ct. Cl. 388 (June 1966). Its counterpart applicable at the time of plaintiff’s physical examination on November 8, 1951, was AE 40-100, C-l, August 27, 1951, paragraph 10e(7) of which incorporated by reference AE 40-115 as to the manner of accomplishing the physical profile pending amendment of AE 40-105. The “P” in the profile stood for physical capacity or stamina. If a profile contained a number 3, as in plaintiff’s case on November 8,1951, it represented that the individual met the requirements for limited military service as prescribed in ME 1-9, but was not physically qualified for general military service.
(f) On October 16,1952, plaintiff was offered an indefinite appointment as a Eeserve commissioned officer, in the grade of First Lieutenant, Infantry Eeserve Corps. Plaintiff accepted this appointment on October 17,1952.
(g) On February 10, 1953, plaintiff appeared before a Medical Board in Japan for evaluation of his old healed chest wound. The board diagnosed plaintiff’s condition as follows:
Wound, penetrating, right chest, healed, with residual symptoms scarring due to a pleural thickening and adhesion.
The Board stated thait plaintiff had been admitted to active duty on September 14,1950, with a waiver, that his disability *1161 was shortness of breath, on exertion and pain in the right lower chest posteriorly, and recommended that he be granted a permanent profile of a í ? i 1 with no combat or vigorous or strenuous exertion, and that he be stationed at a fixed installation of a service organization. The board rated plaintiff with a partial permanent disability for military service, and recommended him for general service and qualified for overseas assignments. These diagnoses and recommendations seem to be internally inconsistent, and partially to conflict with AR 40-105, January 9,1952, paragraph 38 of which limits acceptability to P-1 and P-2 profiles where the defects concern the chest wall.
(h) On March 6, 1953, the plaintiff requested to be relieved from active duty, effective May 28, 1953. At that time his appointment was for an indefinite term. The request was approved. Hospitalization or an appearance before a Physical Evaluation Board was neither requested nor proffered. On May 25,1953, he was returned from Japan to the United States for release from active duty. On June 8, 1953, he was released from active duty, not by reason of physical disability, in the grade of Captain.
16. Separation Examination, Jwne 5, 1953. On June 5, 1953, plaintiff was given a physical examination for separation purposes. In the Report of Medical History the plaintiff checked “yes” to having had (or having) soaking night sweats, shortness of breath, pain or pressure in chest, chronic cough, frequent trouble sleeping, frequent or terrifying nightmares, and nervous trouble of any sort. In the clinical evaluation the examiner reported an abnormal lung and chest condition (inspiratory wheeze and rhonchi, right lateral chest), and abnormal scars (the right chest, right upper arm, and left thigh). The examiner also found that plaintiff had occasional chest pain on exercise, chronic shortness of breath, and that he suffered from an anxiety state in 1947 which was asymptomatic at the time of his examination in 1953. Plaintiff was recommended as qualified for separation with a physical profile of 1 and a physical category of A. (Note that four months earlier, in February 1953, a Medical Board in Japan had given plaintiff a permanent profile of 3, as reported in finding 15(g), supra.)
17. VA Compensation Claims, 1953-1961¡..
*1162 (a) On June 10,1953, plaintiff applied for disability compensation from the Veterans Administration because of his chest wounds and chronic moderate anxiety state. At a VA physical examination in September 1953 the examining physician found a moderate anxiety reaction but no objectively manifested physical disability. The psychiatric examination reported that plaintiff “has more psychoneurosis than he likes to admit or more than he shows easily. * * * There is a great deal of unconscious avoidance of the idea of nervousness and hysterical inability to admit that he is ill in any nervous way and yet considerable over-emphasis on the other hand on his physical difficulties. * * *” On October 16, 1953, the VA granted plaintiff disability compensation from June 10,1953, with a combined disability rating of 50 percent (gunshot wound 30 percent, pleural cavity injury 20 percent, anxiety reaction 10 percent).
(b) On July 11, 1955, on the basis of a neuropsychiatric examination 'by the VA in May, plaintiff’s combined disability rating was increased to 60 percent from May 25,1955, by reason of increasing the previous rating of 10 percent for his anxiety reaction to 30 percent. The examining physician found that he had an acute severe anxiety reaction with some schizoid features, but was unable to determine how many of these manifestations were schizoid in nature and how many were due to his war service, so resolved the doubt in the plaintiff’s favor. For reasons that are not apparent, on March 15, 1957, the VA redetermined plaintiff’s disability rating of 60 percent, including 30 percent for anxiety reaction.
(c) On the basis of plaintiff’s letter and medical evidence in November 1961, the VA increased his disability rating to 70 percent as the result of “evaluation for Service Connected residuals of Gunshot Wound, chest and nervous condition.” The basis of this combined rating is not in evidence.
(d) On March 1, 1963, the VA increased the plaintiff’s combined disability rating to 100 percent during the period of his hospitalization from January 7, 1963 to February 2, 1963, and 90 percent thereafter, based upon a 70 percent rating for anxiety reaction with depressive features, 40 percent for moderately severe residuals in the pleural cavity due to gunshot wounds, and 30 percent for moderately severe (major) residuals from the gunshot wounds in his right *1163 posterior chest. The rating specialists commented that plaintiff could contemplate only marginal employability in the future principally because of his anxiety reaction evidenced by depression, insomnia, and poor work record. On August 11, 1964, plaintiff’s disability evaluation was increased by the VA to 100 percent because of unemployability.
(e) Plaintiff’s disabilities, both psychiatric and physical, have been found by the YA to have been aggravated by plaintiff’s service during the Korean war. He has had outpatient YA treatment since May 1955 with much medication and consultations. During various periods from 1955 to 1965 Doctors John R. Shauver and Warren T. Brown of the YA gave plaintiff intensive psychiatric treatment in an effort to rehabilitate him.
(f) The report of the neuropsychiatric examination which plaintiff had at YA in May 1955, made a diagnosis as follows:
Anxiety reaction, acute, severe, with some schizoid features.
a. External precipitating stress: Experience in battle in World War II. Disturbed marital difficulties. Adult situational demands.
b. Predisposition: Always a tense, anxious individual with urges to steal.
c. Degree of incapacity: Moderate.
Random observations from the collective YA examinations of plaintiff: pain on exercise, back pain, marked despondency, nervous, insecure, tense, trembling, unable to relax, restless, unable to sit still, irritated by noise, hands markedly moist, irritability, guilt feeling, frustrations, blind and hysterical indifference to symptoms, inability to admit nervous illness, blank and hysterical expression.
18. Active Duty in Reserves.
(a) On September 17,1953, plaintiff accepted an appointment as Captain in the Army Reserves.
(b) 1954. Plaintiff served on active duty as Captain in the Reserves from July 11-25, 1954. He had certified on July 12,1954 that he considered himself sound and well and physically qualified for full military duty both then and upon his release in June 1953, and that his condition remained about the same in that period. At the conclusion of his tour of duty on July 25,1954, he certified that there had been no *1164 change in his condition during the tour of duty and that he was suffering from no disability or defect which was not present at the beginning of his tour. Yet on March 31,1954, he was inquiring about his eligibility to appeal his physical disability retirement claim to the Disability Review Board. Also, at the time of his 1954 tour of duty he was rated 50 percent disabled by the YA since June 1953 (finding 17(a), supra). And in 1953 and 1954 he had been unable to hold a civilian job more than briefly due to physical shortcomings and inability to get along 'with his employers or customers (see finding 23, infra). Thus, there seems to be a basic inconsistency between the plaintiff’s representations in connection with his reserve tour in 1954 on the one hand, and on the other his YA disability rating, his intention to pursue a physical disability discharge, and his spotty work record.
(c) Plaintiff served another tour of active duty in the Reserves from August 6 to August 20,1955, again certifying that he was sound and well and physically qualified for full military duty. How truthful this certification was may be questioned, since on July 11, 1955, the VA increased his disability rating to 60 percent from May 25, 1955, because of an increase for his anxiety reaction (see finding 17(b), supra). Further, a witness, Mr. Dillbeck, who served with plaintiff during the two-week tour of active duty in 1955, testified that in that period he visited the plaintiff every day because he was reported to be quite ill, slept all the time, was in a depressed mood and not communicative, did not participate in social or extracurricular activities, and seemed to be in another world. Also, in 1955 the plaintiff was receiving intensive psychiatric treatment and therapy at the Mental Hygiene Clinic of the YA by Dr. Brown, an eminent psychiatrist, who found plaintiff to be in a state of considerable emotional instability and was endeavoring to rehabilitate him so that he could maintain employment. Under the circumstances the plaintiff’s certification as to being in good physical condition in connection with his 1955 tour of duty seems to have been a fabrication.
(d) Plaintiff served a two-week tour of active duty in the Reserves from August 11 to August 25,1957, again certifying that he was physically qualified for military service and in the same condition as when separated from active duty in *1165 1953. It is observed that these physical certifications by plaintiff were standard inclusions in his active duty reports for his annual two-week tours of duty in 1954,1955, and 1957. In the report of his periodic medical examination on August 27,1957, two days following the conclusion of his 1957 tour of active duty, there were reported his several years of soaking sweats, shortness of breath, chest pain due to wound, depression, loss of memory, nervous trouble, and scars from battle injuries. The report found him qualified for general military service with a physical profile of P-1. In an evaluation report for this tour of duty in 1957 the rating officer reported that plaintiff appeared physically fit for field duty, and high mental and moral qualifications, pleasing personality, self- sufficient, cooperative, courteous, ably performed his duties, and more than met the standards expected of an officer of his grade. At this time plaintiff was still rated at 60 percent disability by the VA, and in 1956 and 1957 had been unable to maintain employment more than briefly (three jobs driving cabs and working in post office).
(e) On June 19, 1959, plaintiff was notified that he had been found physically disqualified for Ready Reserves on the basis of his periodic physical taken in March 1959, that his disability was service-connected, that he was eligible for transfer to the Retired Reserves and must apply for such transfer, or be discharged. On the basis of plaintiff’s request for transfer, on July 6,1959, he was transferred to the Retired Reserves.
19. Army Board for Correction of Military Records.
(a) Having been granted 50 percent disability compensation by the YA from June 10, 1953 (finding 17(a), supra), on March 31,1954, the plaintiff, through the Disabled American Veterans Organization, asked the Adjutant General’s Office whether he was eligible for a review by the Army Disability Review Board of the action in 1945 by the Army Retiring Board (finding 10, supra). In response the Adjutant General’s Office advised plaintiff that his procedure would be to file an application with the Army Board for Correction of Military Records. Plaintiff did so on July 12, 1956, and on October 31,1956, the Correction Board decided, without a hearing (none being requested), that the application should be denied. Plaintiff was notified of this action by *1166 form letter from the Adjutant General dated November 14, 1956. Thereafter, plaintiff applied for reconsideration, a hearing was held, and on November 6, 1957, the Correction Board again denied plaintiff’s application, which denial was approved by the Assistant Secretary of the Army on August 23, 1958. Plaintiff applied for further reconsideration on September 19, 1961, and by letter dated October 9,1961, the Correction Board again denied the application.
(b) Other than the Correction Board’s action of November 6, 1957, the decisions of the Board were pro forma and conveyed the Board’s decisions without discussion. The Board’s decision of November 6, 1957 is summarized as follows:
In addition to the plaintiff’s application, the Board considered a case summary prepared by an examiner for the Board, a 25-page transcript of a hearing before the Board at which plaintiff was represented by a representative of the Disabled American Veterans, plaintiff’s AG 201 file, his medical records, and his efficiency file, all of which records are contained in the record before the court. The Board adopted by reference the facts contained in its examiner’s case summary which reflected plaintiff’s enlisted and commissioned service record, his combat wounding in February 1945, action by the Army Betiring Board in 1945 finding plaintiff permanently incapacitated for active service because of his combat wounds and his chronic moderate anxiety state due to combat duty and recommendation for permanent limited service, the Surgeon General’s nonconcurrence in 1946 with the action of the Army Betiring Board, plaintiff’s reentry on active duty in 1946 with noted physical defects, his reclassification in 1947 to general military service with a waiver of physical defects, his recall to active duty in 1950 physically qualified for general service despite noted physical defects, recommendation of the Medical Board in February 1953 that plaintiff be granted a permanent profile of P-3 (with no combat, vigorous or strenuous exertion), plaintiff’s release in June 1953 at his request, his VA disability compensation rating of 50 percent (including 10 percent for anxiety reaction) and its increase to 60 percent in May 1955 because of a 30 percent rating for anxiety reaction, and the Office of the Surgeon General’s advices of August and September 1956 recommend *1167 ing against disability retirement on the basis of “a complete study of the record in conjunction with the psychiatric and neurology consultant”. The Correction Board concluded:
1. That it concurs in the opinion expressed by the Surgeon General’s Office that at the time of applicant’s relief from active duty on 6 February 1946, 25 July 1949 and 8 June 1953 the residuals of the service incurred condition were not of such degree as would have warranted his retirement by reason of physical disability under the laws, rules, regulations, and policies then in effect.
(c) From the foregoing it is observed that, if the Correction Board did not rest its decision exclusively on the advices of the Surgeon General, at least its decision omitted any meaningful discussion of the complicated and contradictory service and medical record which would reconcile the inconsistencies in the context of applicable regulations so that the applicant would be able to determine the validity of the reasons for the rejection of his application. Because of this singular omission it is desirable to examine the contents of the advices by the Surgeon General to which the Correction Board acceded.
(d) Comments Numbered 2 and 4 from the Surgeon General, dated August 28 and September 25,1956, addressed to the Correction Board suggest the existence of Comments Numbered 1 and 3, neither of which appears in the record. Comment Numbered 1 reports a careful review of plaintiff’s records, the fact that he had been wounded in combat in 1945 and had painful residual scars, that he had shortness of breath on exertion, that he was separated on three separate occasions for reasons other than physical disability in 1946, 1949, and finally in 1953, interspersed, of course, with reentries on active duty, that he thereafter served short tours on active duty (apparently referring to his annual two-week tours of duty with the Reserves), that “although this officer had residuals of his combat wounds which may be rateable •under the Veterans Administration Schedule, they were not of such nature or degree as would have precluded further military duty”. The Surgeon General then expressed the opinion that at the time of plaintiff’s separations in 1946, 1949 and 1953 he “did not have any physical disability of such nature or degree as would have warranted his retire *1168 ment because of physical disability under the rules, regulations, laws, or policies then in effect”. Upon receiving this advice, the Correction Board on September 18,1956, returned the case to the Surgeon General for further consideration “in conjunction with Psychiatry and Neurology Consultants inasmuch as counsel has raised a question of neuropsychiatric disability”, plus plaintiff’s contention of service aggravation. This prompted Comment Numbered 4 of the Surgeon General dated September 25,1956, which, after stating that plaintiff’s case had been “carefully reviewed jointly with the psychiatry and neurology consultant to The Surgeon General”, recited plaintiff’s combat wound residuals, referred to his satisfactory performance of duty subsequent to recovery from his injuries, that “he has repeatedly been considered as fit for duty and has repeatedly demonstrated his ability to perform his duty in a satisfactory manner”, but that despite the VA’s award of disability compensation the plaintiff did not have any physical disability at the time of his separation that would warrant retirement because of physical disability under the laws, rules, regulations, or policies then in effect.
(e) The advices of the OSG to the Correction Board, referred to in the preceding paragraph, omit mention of:
(1) Plaintiff’s abundant specific symptoms, except for painful scars on the back of his chest, and shortness of breath, although they were replete in the medical records as reported in this report.
(2) Plaintiff’s psychiatric disabilities, although these were specifically brought to the attention of the OSG and were the specific reason for requesting the final response of the OSG to the Correction Board.
(3) Plaintiff’s classification for limited duty.
(4) Service aggravation of plaintiff’s condition, although this too was specifically requested of the OSG, and the VA had found in 1957 that plaintiff’s last tour of 1950-53 aggravated his service-incurred previous condition.
(5) Action of the Medical Board and Army Betir-ing Board in 1945 as to plaintiff’s incapacity for active duty.
(6) Lack of psychiatric or neurological examinations upon separation in 1946,1949 and 1953, although plaintiff’s medical records indicated anxiety reaction.
(7) VA’s determination of 60 percent disability at the time of the OSG advices in 1956.
*1169 (8) Plaintiff’s spotty efficiency reports covering bis limited service assignments after 1946.
(9) Poor civilian work record following bis three separations from active duty.
(10) Plaintiff was compelled to transfer from tbe Eeady Deserve to tbe Eetired Deserve in 1959 due to physical disqualifications (finding 18(e), supra).
20. Plaintiff’s Physical Condition During Service and at the Time of Release in 1953.
(a.) Tbe bullet or bullets which passed through plaintiff’s chest damaged all of the organs in its track — the walls or lining of the chest or pleural cavity, the diaphragm, the lung, the intercostal nerve due to the rib damage, and possibly the myocardial muscle of the heart.
(b) These injuries were followed by the accumulation of scar tissue or adhesions. Damage to the “Musculoskeletal System”, caused by missiles, is described in the Veterans Administration Schedule for Eating Disabilities, 1945 edition:
8. Effect of Missiles. — Through and through wounds and other wounds of the deeper structures almost invariably destroy parts of muscle groups and bring about intermuscular fusion and binding by cicatricial tissue and adherence of muscle sheath. Thus, the muscles no longer work smoothly but pull against fascial planes and other muscles with which they are fused, so that delicate, coordinated movements are interfered with and there is loss of strength. After prolonged exertion the stresses and strains due to these disarrangements bring about fatigue and pain, thus further interfering with the function of the part.
$
10. Deeper Structures. — A description of the residuals of such a wound in terms of one or more superficial scars does not, however, evidence the application of medical knowledge and observation to the extent required. The whole track of the missile should be envisaged in its passage through skin, muscle, and fascial planes, and also any bone or nerve involvements either evidenced as disability or as inevitably resulting from the course of the missile. * * *.
11. Muscle Injuries. — Disability from injuries of muscles presents a special problem. Shrapnel and shell fragments and high velocity bullets may inflict massive damage upon muscles with permanent residuals. The *1170 principal symptoms of disability from such muscle injuries are weakness, undue fatigue-pain, and uncertainty or incoordination of movement. The physical factors are intermuscular fusing and binding, and welding together of fascial planes and aponeurotic sheaths. In those scar-bound muscles strength is impaired, the threshold of fatigue is lowered and delicate coordination is interfered with. Skin scars are incidental and negligible. It is the deep intramuscular and intermuscular scarring that is disabling. * * *.
(c) The development of scar tissue or adhesions had been noted in the medical records. The Disposition Board in February 1953 referred to the scarring due to pleural thickening and adhesions; the tenting of the left diaphragm due to bronchodiaphragmatic adhesions. The Madigan and Mitchell hospital X-rays in 1945-46 showed a flattening of the right leaf and tenting of the left leaf of the diaphragm, attributed to pleural scarring. Intrapleural adhesions of the right chest, resulting from penetrating bullet wounds, were noted at Mitchell and by the Disposition and Betiring Boards in 1945.
(d) As a result of the scarring and adhesions, the plaintiff suffered the following effects:
(1) Chest Pressure and Pain. — Plaintiff experienced pressure and pain in his chest due to the lesions in the chest wall, extensive pleural adhesions in the lower third or half of the chest; he experienced pain when he exercised. The chest pains, together with plaintiff’s respiratory difficulties, were the reasons for his P-3 profile in February 1953 and he complained of it at his separation in June 1953. As of the time of his release, the Veterans Administration awarded bim a 20 percent disability rating for these symptoms resulting from the damage to the pleural cavity.
(2) Bach Pain — Bibs.—Plaintiff’s predominant pains were those he suffered in his back, at the site of the exit of the bullets and where portions of the ribs were shot out. He experienced them upon physical exertion. They were aggravated by his handling of heavy mail bags in Japan where, after complaints, he was given physiotherapy, with no benefit. He experienced them at other times when he attempted to lift or carry heavy objects, as when he moved his household in 1953 and later. As a result, he could do very little *1171 work around the house — most of which was done by his wife.
The loose ribs near the site of the wound were sensitive to touch, and caused difficulty in sleeping or in prolonged sitting.
Plaintiff’s back pains accounted for 30 percent of the 50 percent VA disability rating as of the time of his release and, together with his chest pains, resulted in the February 1953 P-3 profile.
(3) Respiratory Difficulties. — One of plaintiff’s most troublesome problems was his difficulty in breathing and shortness of breath. At times he felt as if he were suffocating. It occurred most often at night when he slept in a certain position. The breathing difficulty was due to the pleural adhesions which interfered with comfortable and efficient respiration and limited the capacity for breathing on physical exertion; to the tenting (pulling upward) of the diaphragm by the contracting scar tissue; to the damaged lung, tied up by scar tissue interf ering with normal exchange of air. As has been seen, there had been a severe injury to the right lower lobe, a hemothorax and thoracotomy, severe “intrinsic lung damage” for which oxygen was initially given, a primary, atypical pneumonia; the later presence of fluid and possible pneumonitis; diminished breath sounds; wheezes and rhonchi.
The 1953 Disposition Board’s P-3 profile was partly due to plaintiff’s inability to breathe on exertion.
(4) Fatigue. — Plaintiff’s chest and back condition and respiratory difficulties caused easy fatigue during physical exertion of cold weather.
(5) Heart Condition. — Abnormal electrocardiograms in 1961, together with plaintiff’s dyspnea on slight exertion, indicated that plaintiff’s myocardial (heart) muscles were damaged. This may have been due to the original wound in the chest when minute strands of scar tissue may have been laid down on heart muscle within a few hours after the injury to repair the damage of shock. It may also have been due to the extensive damage to the right pulmonary areas by the passage of the machinegun bullet. Connections may then have developed between arteries and veins which caused the passing of the blood back into the heart without adequate exposure to oxygen.
*1172 21. Plaintiff's Psychiatric Condition During Service and at the Time of Release in 1953.
(a) In addition to bis physical ailments, plaintiff suffered psychiatric disability at the time of his release. The existence of emotional and mental disturbance was noted shortly after his wounding, during his hospitalization in England and in the United States. It was noted in his subsequent service from 1946 to 1949. In 1947 he was examined by psychiatrists at Madigan General Hospital, but was cleared and the Disposition Board placed him on permanent limited duty on the basis of his physical condition only. In 1949 he went voluntarily to Camp Funston for psychiatric assistance and reassignment. At the end of the interviews there he was considered well-adjusted. During his last tour of duty, 1950-1953, he was given a permanent P-3 profile on the basis of his physical difficulties only. There was no psychiatric or neurologic examination.
(b) The plaintiff’s psychiatric condition was manifested by the following symptoms:
(1) Depression. — In Japan plaintiff was very despondent, cried often, and purportedly tried to commit suicide by lying down on a congested highway. Upon his return to the United States in 1953 his mother reported that he was in a fog of despair. A marked despondency was reported in his VA examination of September 1953. The spells of depression had begun in 1949. They continued after his release in 1953.
(2) Dreams of Violence, Nightmares, Night Sweats, Insomnia. — During his last tour of duty, plaintiff began to experience violent nightmares and night sweating. He dreamt of sewers and dark rivers with cadavers spread al-1 around, but most of the dreams were of fighting with the Germans. He often became violent during these dreams, struck the pillow or bedboard with his fists, and struck his wife quite often. He was not aware of nor did he remember his acts of violence. He became confused during the night, wandered about the house, and on one occasion used a clothes closet for a toilet.
During these dreams his pulse became very rapid and his heart raced. He perspired very profusely. The bed be *1173 came drenched. His wife had to change the sheets and pillow slips at least twice during the night.
His insomnia was a continuous problem from 1951. It was caused not only by his dreams but by the pain in his right side and his breathing difficulties. In the morning it was extremely difficult to awaken him. At times it was necessary to apply hot or cold towels for approximately 30 minutes.
In June 1953 plaintiff reported his “soaking night sweats” and his frequent and terrifying nightmares. These difficulties were recorded in the September 1953 VA examination and in subsequent examinations. There were incidents of violence such as breaking china, attacking his wife, almost suffocating her by placing his hand over her face to keep her silent while “fighting the Germans”.
While there was a reference to nightmares in the 1947 examination and to trouble in getting to sleep after drinking in 1949, his real problem began in 1951 after he had entered his final tour of duty.
(3) Nervousness, Tenseness, Fears, Anxiety.—
(a) Plaintiff was very nervous and tense during the latter part of his 1950-1953 tour of duty. His Efficiency Reports in the last half of 1952 and early 1953 described him as “highly nervous — very excitable — always in a hurry”, “extremely nervous — gets excited easily”; and in his VA examination of September 1953, he was reported nervous, insecure, tense, trembling, unable to relax, restless, unable to sit still, irritated by noise, his hands markedly moist. He testified that he possessed fears which were unreasonable, continuous, terrifying, explosive. Plaintiff’s nervousness and fears rendered him very unstable.
(b) In the 1947 examination, plaintiff had complained of being tense and restless; had expressed fear of a desire to kill and of homosexual tendencies, although the psychiatrist pointed out there was no evidence of such behavior in the past. In the 1949 examination, he complained of noises. Subsequent to 1953 his symptoms continued.
(c) There were, as we have seen, diagnoses of anxiety reaction shortly after plaintiff’s wounding. In June 1953 the VA found an anxiety reaction, moderate; in 1955, acute, severe; in 1961, moderate; in 1963, a “great deal of” anxiety.
*1174 (4) Menboil Impairments. — Among plaintiff’s psychiatric symptoms in 1953 were an impairment of memory and inability to tbink clearly, according to Ms testimony, and complete dissociation with, ideas expressed during conversation. In 1955 Dr. Brown found some of his ideas bizarre and distorted. At the summer camp in 1956, he seemed to be in another world.
(5) Irritability. — In 1953, plaintiff was extremely irritable. In September 1953 the VA doctor thought it was the result of plaintiff’s dissatisfaction with his own procrastination. It was perhaps due to a feeling of guilt in his inability to satisfy his terrific inner drive to succeed or, as expressed in 1949, to his frustrations.
(6) Unsatisfactory Relations with Other People. — During his last tour of duty particularly, plaintiff was unable to get along with other people. He carried a chip on his shoulder. He felt he could not satisfy his superiors and that they persecuted him. He could not get along with his coworkers or, after his release, when he attempted to resume his selling job with Jewel Tea, his customers. He was, by the time he returned to civilian life in 1953, incompatible, withdrawn and noncommunicative. From 1951 he avoided crowds. His difficulty with people was first recorded in 1949 when he stated he was timid in training and handling men, and it has continued since his release in 1953.
(7) Excessive Drinking and Smoking. — Plaintiff’s excessive drinking began in 1951. It gave him a lift, put him to sleep, and eliminated most of his emotional disorders. The first mention of alcohol in plaintiff’s Efficiency Reports came in the report of January 1952 — “likes alcohol”. In June 1953 he himself reports excessive drinking. In Japan he drank whiskey, but after his marriage in June 1953 he transferred to beer. An exception occurred in 1963 when he drank martinis excessively at the Officers Club, which led to hospitalization.
Heavy smoking began in November-December 1950. Although he tried to stop — with pipes, cigars, distasteful cigarettes and medicine — he could not. He smokes more when he is excited.
(8) Somatic Complaints. — It is difficult to determine to what extent plaintiff’s physical disabilities contributed to his *1175 psychiatric difficulties or to what extent the psychiatric disabilities contributed to his physical or organic complaints. The surgeon, Dr. MacQuigg, testified that plaintiff’s pain was real and severe, not simulated; that his insomnia, night sweats and dreams could be the result of hyperventilation; that much of his tension and digestive disturbance could be due to his difficulty in breathing. On the other hand, the VA psychiatrists felt that his “somatic complaints” were symptoms of his psychiatric condition; that he had too much body-consciousness; that he overemphasized his physical difficulties.
22. Plaintiffs Physical and Psychiatric Condition Since His Release. Plaintiff expected that after he reentered civilian life his condition would improve, but it did not. He was unable to acknowledge his psychiatric condition. For this reason he did not accept psychiatric treatment until later although urged to do so. The record of VA ratings of plaintiff for disability compensation on the grounds of anxiety reaction, and of the psychiatric treatment he received at the VA subsequent to 1953, are set forth in finding 17, sufra. His physical and psychiatric condition and symptoms since his release in 1953 are comparable to those existing at that time, with increases reflected by the VA ratings for disability compensation purposes. His prognosis is poor.
23. Plaintiff’s 'Work Record Since His Release.
(a) Plaintiff had some difficulties in performing administrative military work during his 1946-1949 tour of duty. His adjustment to civilian work in 1949-1950 was relatively satisfactory. Although his early military service, during the Í950-1953 tour, was satisfactory, from 1951 on it was poor.
(b) Since his release in 1953 his work record has been extremely spotty, erratic and inadequate. He had attempted no work by September 1953 when examined by the Veterans Administration. His first job was with the Jewel Tea Company where he had been moderately successful prior to his entry on active duty in 1950. He lasted only a few weeks because he could not get along either with his employer or customers, and found the work too much for his physical condition. His subsequent jobs, with one exception (infra, para, (c)), lasted only a few days or months.
*1176 (c) By reason of statutory disability preferences and waiver of physical requirements for veterans, plaintiff obtained a job with the Federal Aviation Agency from 1960 to 1964. Notating shifts minimized contacts with persons creating irritations. In 1961, however, irritability was becoming a problem. In 1964 he was retired for disability on the basis of the VA findings and his emotional instability and highly nervous condition.
(d) Plaintiff’s wife provided the bulk of their support by working as a seamstress and selling paintings.
24. Fitness for Military Service on Release in 195S.
(a) Plaintiff was unfit for military service at the time of his release in June 1953. Each of his major disabilities separately incapacitated him — his physical or organic disabilities resulting from his severe combat bullet wounds and their residuals, and his psychiatric disability resulting from his combat experiences, aggravated by his subsequent service, particularly in 1950-1953.
(b) Disdb ling Physical or Organic Injuries.
(1) Dr. Eodger E. MacQuigg, a specialist in thoracic surgery and a member of the Lovelace Clinic of Albuquerque (which participates in the examination and selection of astronauts) examined and treated plaintiff in August 1961 and March 1963. Upon the basis of his observations, plaintiff’s history and the salient facts of record, he testified that plaintiff was, in June 1953, unfit for military service by reason of his wounds and their residuals. Military service would have been dangerous because it was important for one afflicted with plaintiff’s injuries to set his own pace at work; because exposure or extreme exertion could have caused serious, perhaps fatal, trouble.
(2) Dr. MacQuigg’s testimony showed that the bullets damaged all organs that lay in their track and a short distance on each side due to shock waves, including the pleural cavity in the chest, the back in the area of the exit of the bullets, the ribs which were fractured and partially destroyed, the intercostal nerve, the diaphragm, the lungs, the muscles present in these parts; that, as a result of these extensive injuries, there was a growth of scar tissue or ad-hesions, found in the service, which caused much chest pain, *1177 real and severe, and respiratory difficulties; that there may have been damage to the heart muscle at the time plaintiff was wounded.
(3) Pain was caused by the extensive adhesions to the pleural cavity; by the adhesions resulting from the fracture and loss of substance of the ribs with inevitable damage to the intercostal nerve under each rib. Respiratory difficulties were caused by the adhesions to the pleural cavity; by the damage to the ribs; by the adhesions which pulled one part of the diaphragm upward, “tenting” it, and flattening another part; by the lung damage due to adhesions and the scar on the right lower lobe; and by smoking three packs of cigarettes a day.
(4) Plaintiff’s dreams, night sweats, insomnia, tension and digestive disturbances might have been due to his difficulty in breathing.
(5) The extent of plaintiff’s organic disabilities is reflected in the YA examination of September 1953 and the 50 percent rating as of the time of release for the wounds to the pleural cavity and posterior back.
(6) Defendant’s witness, Lieutenant Colonel Gene V. Aaby, Assistant Chief of Thoracic Surgery at Walter Reed, expressed the opinion, based on medical records alone and without having seen the plaintiff, that in 1953 plaintiff was fit for military duty “relative to his chest”. In reaching this opinion he stressed the fact that plaintiff did not complain nor seek medical attention for his chest. The records, however, show that plaintiff was diagnosed in the service for his intrapleural adhesions and fractured ribs, and the pain and difficulty in breathing resulting therefrom. The witness must have ignored plaintiff’s complaints contained in his June 1953 medical history and application to the YA, the YA examination in September 1953, and the 50 percent YA disability rating.
(c) Psychiatric Disability.
(1) Plaintiff was unfit for military service in 1953 by reason of his psychiatric condition.
(2) Dr. Warren T. Brown, a psychiatrist and neurologist of unusual qualifications, a former head of the department of psychiatry at Yale, consultant to the Army, Navy, Yet- *1178 erans Administration, and other Government agencies, a participant in organizing the 39th Army General Hospital, testified that, upon the basis of extensive treatment of the plaintiff in 1955-1956, when he came to know the plaintiff “extremely” well and when he tried in vain to rehabilitate him, upon his history and the facts of record, plaintiff was not psychiatrically fit for military service in 1953, not even for limited duty. Within two years after plaintiff’s release, the doctor found him suffering from a great deal of tension, marked vasomotor instability, sweating, trembling, flushing and paling, extremely restless, frightened. His condition had been aggravated by his service during the Korean conflict.
(3) Dr. John K. Shauver, a diplómate in psychiatry, author of published scientific articles in this field, a Lieutenant Colonel in the Medical Corps during World War II, and a member of the Veterans Administration for 30 years, testified, upon the basis of his examination and treatment of plaintiff in June 1963, from October 1964 to January 1965, and in May 1966, and upon plaintiff’s history and facts of record, that plaintiff was psychiatrically unfit for military service in 1953. He referred to plaintiff’s very unsatisfactory industrial history from 1953 and the fact that he broke down in periods of stress.
(4) The defendant’s witness, Colonel Vincent Sweeney, Assistant Chief of the Psychiatric and Neurologic Service at Walter Keed and consultant to the Surgeon General, testified that upon the basis of the medical records, never having seen plaintiff (a concededly weaker basis for an opinion than that of having observed the patient), it was his impression that plaintiff was not unfit for military service in 1953. He agreed that a host of individuals had been retired for psychiatric disability and that combat neuroses and neurotic disorders were caused by repeated narrow escapes, high combat losses, frequent exposure to mutilation and death of close friends, the fear of being a coward or of losing self-control and the realization of responsibility for the lives of others, experiences and emotions which plaintiff had sustained in profusion. This witness indicated that plaintiff may have had anxiety in combat, as is a common occurrence, but did not have a diagnosis of “anxiety reaction”, a different matter. The doctor was apparently unaware of the diagnosis of anxiety *1179 reaction in tbe service and of the 1953 VA findings of irritability, insomnia, soaking night sweats, excessive drinking, fear of noise and of high places, lack of self-confidence, restlessness, markedly moist hands, blank hysterical conversion-type expression, hysterical indifference to symptoms, inability to sit still and to relax, with a final diagnosis of anxiety reaction, moderate degree.
25). Conclusions.
(a) Plaintiff was unfit for active military service at the time of his release in June 1953. His incapacity was incurred in and aggravated by the service. Under the Veterans Administration Schedule for Rating Disabilities in effect in 1953, his percentage of disability was a minimum of 50 percent, and he was entitled to disability retirement pay from the day of his release in an amount based upon such percentage of disability.
(b) The refusal of the Army Board for the Correction of Military Records to correct the plaintiff’s record to show such disability and its reliance upon the inadequate advice of the Office of the Surgeon General was not supported by substantial evidence and was contrary to the clear, convincing, and cogent evidence.
CONCLUSION OK LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on his claim and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 47 (c).

The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 37 U.S.C. § 272(a), 1952 ed: Upon a determination by the Secretary concerned (1) that a member * * * is unfit to perform the duties of his office, rank, grade, or rating, by reason of physical disability incurred while entitled to receive basic pay * * * (s) that such disability is SO pei'centum or more in accordance with the standard schedule of rating disabilities in current use by the Veterans* Administration * * * such member shall be entitled to receive disability retirement pay * * *.

 There is no reference in these examination, reports to the fact that the Disposition Board and the Retiring Board had found plaintiff fit only for limited duty, and it is not known whether the examining doctor was aware of this background.