**Antonio A. VERSACI**

v.

**The UNITED STATES.**

**No. 104–65.**

United States Court of Claims.

Nov. 15, 1968.

---

9. 10 U.S.C. § 679 (1964).

10. See note 8 supra.

Paul R. Harmel, Washington, D. C., attorney of record, for plaintiff.

Charles M. Munnecke, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on June 28, 1968, wherein he recommended that plaintiff is entitled to recover disability retirement pay, computed on the basis of a disability rating of 40 per centum, from the day following the date of his removal from the Temporary Disability Retired List, less such deductions as may be appropriate, with judgment to be entered for plaintiff and the amount of recovery to be determined in further proceedings pursuant to Rule 47(c). Although defendant obtained extensions of time for the purpose of filing exceptions to the commissioner's opinion and report, neither side filed exceptions and on October 1, 1968, the parties filed a stipulation for entry of judgment, based upon the recommendation made by the commissioner, stipulating that judgment be entered for plaintiff in the sum of $18,034.46.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, it hereby adopts the same, as hereinafter set forth, together with the stipulation of the parties filed October 1, 1968, as the basis for its judgment in this case. Therefore plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $18,034.46.

## OPINION OF COMMISSIONER

### GAMER, Commissioner:

On September 1, 1955, plaintiff, a doctor and Army captain, was, after, separation from the service for physical disability, placed on the Temporary Disability Retired List. While on such list he received disability retirement pay. However, on June 30, 1960, plaintiff was, upon a finding that he was then deemed physically fit for active duty, removed from the list. His disability retirement pay thereupon ceased. Plaintiff then applied to the Army Board for Correction of Military Records to correct his records to show he was actually physically unfit on June 30, 1960, with a permanent disability rating of 40 percent. However, on December 16, 1964, the Board, after a hearing, concluded that the finding that plaintiff was fit for duty at the time he was removed from the Temporary Disability Retired List was neither erroneous nor unjust, and accordingly recommended that plaintiff's application be denied. On February 10, 1965, the Secretary of the Army approved the Board's findings and recommendation and denied plaintiff's application, and on March 30, 1965, plaintiff filed his petition herein, claiming such action to be arbitrary, without substantial evidentiary support, and legally erroneous.

Prior to his tour of duty in the Army (July 1, 1953—September 1, 1955) which led to his being placed on the Temporary Disability Retired List, plaintiff had, from July 1, 1943, to December 22, 1945, served on active duty in the Navy as an enlisted man. He had incurred an ulcer during such Navy service, for which, after release from active duty, he received a 10 percent disability rating from the Veterans Administration.

After his release from such active Navy duty, plaintiff completed his studies at medical school. He then became a hospital intern and thereafter a resident.

In 1950, the so-called Medical Registrants Act (amending the Selective Service Act of 1948) was passed (Pub. L. No. 779, Sept. 9, 1950, 64 Stat. 826) in response to the Services' needs arising from the outbreak of the Korean conflict. The Act authorized the President to require, on the basis of requisitions submitted by the Department of Defense, the special registration of certain persons (i. e., below age fifty) qualified in specified medical and allied specialist categories and needed by the Services, with persons called thereunder to be "liable for induction for not to exceed twenty-one months of service in the Armed Forces." (Sec. 1)

Because of his ulcer condition, plaintiff had been classified in the draft as physically disqualified (4–F). However, on December 24, 1952, the Assistant Secretary of Defense, Anna Rosenberg, issued a memorandum to the Secretary of the Army pertaining to "Physical Standards for Physicians * * *," which stated that "It shall be the policy of the Department of Defense to consider all physicians * * * potentially acceptable for military service, provided they can reasonably be expected to be productive in the Armed Forces," and that such policy permitted "the re-evaluation of certain physicians * * * who as a result of previous physical examinations have been classified as physically disqualified because of substandard physical findings." The memorandum went on to provide that "In general, those with static impairment and those with chronic progressive or recurrent diseases, if asymptomatic or relatively so are considered to be acceptable for service."

Promptly after the issuance of this new policy, sometimes referred to as the "Rosenberg standards," plaintiff's draft board ordered him to report for an Armed Forces Physical Examination, which was had on January 7, 1953. Plaintiff's history showed that, during the approximately eight-year period from its inception in 1945 to the physical examination in 1953, his ulcer had hemorrhaged three times; first in 1946, while he was a medical student (and which was during his strenuous, concentrated and accelerated naval medical training program), and when plaintiff's ulcer condition was first confirmed; the second, three years later, in 1949, while he was a hospital intern (during a period of unusually arduous duty, intensified by a polio epidemic in the community); and the third time, again some three years later, in 1952, while he was a hospital resident (apparently induced by cortisone treatments for an asthmatic condition, and considered as a minimal episode). This last episode had occurred only four months prior to the physical examination. During the three-year periods between the hemorrhages, plaintiff had been relatively symptom free, and was able to control his condition successfully with occasional antacid medication and by maintaining a restricted diet. Except for the hemorrhage periods themselves and the following periods of convalescence, plaintiff's condition did not seriously interfere with his work, and at the time of his examination he was again quite symptom free, although still observing diet and medication requirements. However, despite the "Rosenberg standards", and the then apparently quiescent state of plaintiff's ulcer, the examining physician, after noting plaintiff's history of three hemorrhages and that plaintiff was "still on treatment," found plaintiff to be disqualified for military service (the Rosenberg memorandum also stating that the new policy promulgated should not "be construed to mean" that the persons covered thereby should be "assigned to duties * * * which are beyond the limitations imposed by their physical capabilities").

Shortly thereafter the Army's Adjutant General, by memorandum of January 12, 1953, advised the various Commanders in Chief that, under the

Rosenberg standards, "examining physicians and reviewing authorities" were permitted "to use their discretion in the application of existing physical standards if the special registrant can be reasonably expected to be physically capable of performing military service and to remain so for a reasonable period of time." The memorandum listed certain "conditions * * * previously considered as a cause for rejection [which] may now be considered as acceptable for appropriate assignment consideration." One of such conditions listed was "Peptic ulcers, unless complicated by obstruction or verified history of repeated hemorrhage."

On March 9, 1953, the Medical Section, First Army, in reviewing plaintiff's case, concluded that plaintiff should serve, finding him "to be physically qualified for general military duty with waiver for duodenal ulcer." Apparently, the Section did not feel that plaintiff's case showed a "history of repeated hemorrhage" within the meaning of the Adjutant General's memorandum, there also being no indication of obstruction complications.

Instead of thus being subject to the draft, plaintiff promptly thereafter applied to the Army for extended active duty, and on April 17, 1953, was commissioned as First Lieutenant, Medical Corps, United States Army Reserve. The appointment was subject, however, to a medical examination showing qualification for such service. Accordingly, plaintiff underwent another physical examination. Again the physician conducting such examination concluded (after a consultation with a gastroenterologist) that, because of the hemorrhage history, plaintiff was "not qualified for General Service," but once more the Medical Section found him so qualified "with waiver for history of duodenal ulcer," and plaintiff was shortly thereafter ordered to report for active duty on July 1, 1953 (his VA 10 percent compensation award ceasing upon such date). Two months later, plaintiff found himself in Korea.

Although the Korean Armistice had been signed on July 27, 1953, shortly before plaintiff arrived in Korea in September 1953, the area was still officially classified as a "combat zone," and remained so classified throughout the period of plaintiff's tour of duty there, i. e., to January 1955. For the most part, plaintiff's duties were arduous and at times hazardous. Generally working twelve hours a day, plus many night calls, he handled, with inadequate help, a very large patient load. He had very little time off. For a period of some five months (October 1953—February 1954) he was in charge of the 12th Dispensary at Pusan. A great fire broke out in Pusan in November 1953, in which about a third of the city was destroyed, and plaintiff was in charge, for approximately a month, of a hospital train in the city's port area, which was set up to serve 35,000–40,000 refugees. Thereafter, plaintiff served for a period on a hospital train transporting injured soldiers from Chongkok to Wonju, which was north of the 38th parallel, the area still being subject to sporadic fighting (sections of the railroad having been blown up, and the train itself being equipped with gun plates and mounted guns). He then served for a period in Sokchori, which was north of what had been the main resistance line, and where there was still some guerrilla warfare. A second great fire occurred in Pusan in January 1954, when plaintiff took charge of another hospital train for another month, during which time he (and four less well-trained Korean doctors) treated approximately one thousand patients a day. Thereafter, he took charge of the 132nd Dispensary at Pusan. In addition to the American military, he had to serve the needs of Korean military units, Red Cross and United Nations personnel, and members of the Merchant Marine. Between March 1954 and January 1955, plaintiff was sometimes required, in addition to his full-time medical duties, to perform dangerous intelligence work relating to traffic in narcotics from 4–5 a. m. to 8 a. m.

The severe nervous tension and strain to which plaintiff was subjected during his difficult assignments were not, of course, favorable to his ulcer condition. He could not maintain a disciplined ulcer diet, nor, considering his long hours, huge patient load, extended periods of little or no sleep, and supervisory responsibilities, could he obtain adequate rest or relaxation. The general conditions under which plaintiff was required to serve were often quite adverse. At Sokchori, the temperature did not go above zero, plaintiff's quarters consisting of thin plywood barracks with small kerosene heaters. On the Chongkok hospital train, there was no heat at all for six days, and no running water.

Plaintiff performed his duties with such distinction that he received many commendations, as well as the Bronze Star Medal, his citations noting his "meritorious achievement," his "unusual ability," his "outstanding initiative and constant devotion to duty," and his giving "unstintingly of his time to fulfill his mission." However, the arduous service took its physical toll. Shortly after his arrival in Korea in September 1953, he had experienced ulcer pains and some hemorrhage. He was, however, with treatment at the dispensary, able to continue with his duties without significant interruption, despite some food difficulties (inability to retain food, loss of appetite, abdominal distension), and soon thereafter the ulcer again became relatively quiescent, with only minor episodes experienced until October 1954. In that month, however, plaintiff suffered an acute exacerbation. X-rays indicated a "deformed duodenal bulb." He experienced sharp pains almost daily, a condition which persisted throughout his remaining Korean period of assignment. During such period, he experienced nausea, vomiting (caused by inability to retain food, indicating some obstruction, and requiring small multiple feedings), and five hemorrhage episodes.

On January 24, 1955, plaintiff's tour of duty in Korea ended and he was returned to the United States for service at the Army Hospital at Fort McPherson, Georgia. Before entering on such assignment, however, plaintiff, attempting to recuperate, first took a month's leave, but his symptoms persisted. Although serving at the hospital as a resident physician, he himself received treatment there on an out-patient basis. He complained of almost constant pain. In February 1955, plaintiff experienced two hemorrhages.[1] X-rays indicated a partial closing (stenosis) of the pylorus (the region of the opening from the stomach into the intestine in which the duodenal cap is located and through which cap everything from the stomach passes). Hospitalization was considered, but, due to the doctor shortage, plaintiff was asked to carry on as best he could, and he did. However, with his symptoms persisting, plaintiff was, on June 9, 1955, finally admitted as a patient at the Fort Benning Army Hospital. X-rays again indicated a chronic deformed duodenal cap and "marked pyloric stenosis." The Chief of the hospital's Gastroenterology Section diagnosed plaintiff's condition as an active duodenal ulcer and recommended that plaintiff appear before a medical board "for consideration of separation from the service."

On June 21, 1955, plaintiff was transferred back to Fort McPherson Army Hospital, his duty station, but this time as a patient, and on June 24, 1955, a Disposition Board diagnosed plaintiff's condition as "ulcer, duodenum * * * with pyloric obstruction," a condition which it found originated in 1945 while he was in the Navy but which was permanently aggravated by his Army service. It accordingly recommended that plaintiff appear before a physical evaluation board.

On July 5, 1955, plaintiff appeared before a Physical Evaluation Board at Fort McPherson, which heard testimony

1. Plaintiff's condition was aggravated by the preventive therapy treatment for malaria that returnees from the Far East were required to undergo.

from plaintiff, the Chief of Medicine at the hospital, who had examined and was treating plaintiff (who testified, among other things, that, in his opinion, plaintiff was at that time, "totally incapacitated for routine medical practice" and that his ability to engage in the practice of medicine in the future would be impaired since he would not be able to "participate in a full-time medical practice without damage to his health"), and the doctor in charge of the hospital (whose opinion also was that plaintiff was not physically capable of performing the type of duty required at the hospital and that his ability to carry on a civilian medical practice would be impaired). The Board, finding that plaintiff "is beyond any doubt physically incapacitated to continue in any capacity in his office, rank, or grade" and that "following separation from the military service, this individual's capacity for gainful civilian occupation will be comparably impaired," found plaintiff to be permanently unfit for service as a result of a "moderately severe" duodenal ulcer with a 40 percent disability rating (in accordance with the Veterans Administration Schedule for Rating Disabilities).

However, upon review, the Army Physical Review Council (in the Adjutant General's Office), although finding that "according to evidence of record and well established medical principles," plaintiff's ulcer "originated prior to military service but was aggravated during service," but nevertheless feeling that plaintiff's disability was "of such nature that it may improve sufficiently within a five year period" so as to render him fit for military service, concluded that plaintiff's case justified reevaluation in eighteen months. It further concluded that, since plaintiff's defect "was ratable at 10 percentum at the time of entry into active military service and at 40 percentum * * * at

the time of final evaluation," therefore "the net disability resulting from aggravation during service is 30 percentum." Plaintiff accepted the findings of the Council.[2]

Under Title IV of the Career Compensation Act of 1949, 63 Stat. 802, §§ 401–414,[3] each service Secretary is required to establish a temporary disability retired list upon which members of the service who are unfit by reason of physical disability incurred while entitled to receive basic pay are entitled to receive disability retirement pay, provided that the disability is at least 30 percent in accordance with the VA Schedule for Rating Disabilities, and that "accepted medical principles indicate that such disability may be of a permanent nature" (§ 402(a)). The Act further provides that the member's name cannot be on such list more than five years (§ 402 (d)), with periodic physical examinations required at least once every eighteen months to determine whether there has been any change in the disability (§ 402 (e)). If, either as a result of any such periodic examination, or at the end of five years, it is determined that the disability (at least 30 percent) is permanent, the member is then removed from the temporary list and becomes permanently retired. However, if any such determination is that the disability is less than 30 percent, the member is then removed from the temporary list and is separated from the service with entitlement only to disability severance pay. If not made prior thereto, the Secretary concerned is required, at the end of the five-year period, to make a final determination. (Id.) Furthermore, if, as a result of any such periodic examination, the member (of a Reserve component, which plaintiff was) is found to be physically fit, he is (subject to his consent) reappointed in his component (§ 405(b)).

2. Plaintiff inquired, however, concerning "which agency assumes responsibility for the ten percent (10%) service connected disability * * *." His inquiry went unanswered.

3. 37 U.S.C. § 272 et seq. (1952), now 10 U.S.C. § 1201 et seq. (1964).

In accordance with said provisions of the Career Compensation Act, plaintiff was, effective September 1, 1955, placed on the Army's Temporary Disability Retired List, receiving disability retirement pay based upon his grade (Captain) and years of service. He then entered the private practice of medicine, restricting his hours, however, so as to avoid undue stress and strain.

Thereafter, plaintiff remained on such list, receiving disability retirement pay, until June 30, 1960, almost five years, upon which date he was removed therefrom. During such period he had four periodic examinations. Following the last one, plaintiff was declared physically fit for active duty. Plaintiff then applied to the Army Board for Correction of Military Records to correct his records to show he was in fact permanently physically unfit on June 30, 1960, with a disability rating of 40 percent and therefore eligible to continue to receive disability retirement pay. After a hearing, however, and upon also considering the records in plaintiff's case, including an opinion from the Surgeon General, the Board concluded that the finding that plaintiff was fit for duty at the time he was removed from the Temporary Disability Retired List "was not in error or unjust," and recommended that plaintiff's application for correction of his records be denied, a recommendation which the Secretary of the Army approved on February 10, 1965.

For the following reasons, it is concluded that the action that was taken in denying plaintiff further disability retirement pay on the grounds that he was physically fit for active duty is so contrary to the compelling weight of the evidence that it cannot be sustained.

The Correction Board does not indicate, by any kind of reasoned analysis, the evidentiary basis for its fundamental ultimate finding that "upon his [plaintiff's] removal from the Temporary Disability Retired List, there is no recorded, verified, or documented period of ulcer disease, to a degree to warrant a finding of unfitness for duty." Nor is it possible, by an independent analysis of the evidence, to detect upon what the finding is based, since all the probative evidence is the other way.

There apparently is no attack by the Board upon the original action taken in 1955 by the Army Physical Review Council and the Adjutant General, acting for the Secretary, in affirming the Physical Evaluation Board's finding that the 10 percent ulcer disability plaintiff had when he entered Army service in 1953 "was aggravated during service" to 40 percent, and in therefore placing plaintiff upon the Temporary Disability Retired List. Nor, in the light of the evidence as set forth above concerning the severe exacerbation plaintiff suffered toward the end of his extremely arduous Korean tour of duty, the sustained manifestation of painful symptoms thereafter, including five hemorrhage episodes in Korea and two more after his return to the United States, his hospital treatments, and the numerous physical examinations and X-rays, all showing, among other things, a chronic deformed duodenal cap condition, could any such attack be successfully made. In addition, shortly after his separation from the Army, plaintiff was further examined by the VA and was similarly rated 40 percent disabled, the disability again being described as an aggravation resulting from his Army service.[4]

Consequently, defendant's present contention "that plaintiff's condition during his entire [Army] military service [i. e., from July 1, 1953, to September 1, 1955] remained substantially the same as the condition that existed before his 1953 military service" (Def.'s Br., pp. 19–20) is not only rebutted by the overwhelming weight of the probative evidence of record, but is also not

4. Plaintiff received no VA compensation as a result of this determination, however, because of his then being in current receipt of Army disability retirement pay.

supported by any of the Secretary's own findings.[5]

Accordingly, the conclusion in 1960 that plaintiff was then fit for active duty necessarily means that sometime between 1955, when plaintiff was properly placed on the Temporary Disability Retired List with a 40 percent disability rating, and 1960, when he was removed from the list as being fit for duty, his ulcer condition either became cured or at least so improved as to render him so physically fit, and that such was his condition at the time of his release on June 30, 1960. Since, as shown, placement on the Temporary Disability Retired List follows a binding Secretarial finding of then existing physical disability to a degree warranting the receipt of disability retirement pay, which disability "may be" permanent, it is only the condition which exists at the time of removal from the list that is pertinent. Nolte v. United States, 177 Ct.Cl. 1069 (1966).

The evidence shows, however, that during such 1955–1960 period, plaintiff had four periodic physical examinations and none indicated any such cure or marked improvement from the 40 percent disability finding made in 1955. As shown below, they all indicated, on the other hand, not only no such improvement, but that his condition had become permanent.

On February 5, 1967, a Medical Board, following plaintiff's first periodic examination, concluded that plaintiff had a chronic duodenal ulcer, with "scarring resultant stenosis," that his "disability has become permanent," that he was unfit for duty, and that he should appear before a physical evaluation board for reevaluation (as to permanency). On review, however, it was determined that plaintiff should continue on the Temporary Disability Retired List with-

out, at that time, a physical evaluation board reevaluation.

On July 8, 1958, plaintiff underwent his second periodic examination. His symptoms of pain had continued, he had, in the summer of 1957, had another hemorrhage, and he was under the care of physicians. He was on a six-to-eight times' daily feeding schedule, was on antacid medication, and, when unable to obtain the required eight-to-nine hours' rest daily, experienced more severe symptoms and required additional therapy. After X-rays again showed a "deformed" and "constricted" duodenal bulb[6] the Medical Board once more concluded that plaintiff had a "chronic duodenal ulcer with exacerbations and remissions," that, under plaintiff's restricted practice "adjusted to his limitations of rest and diet," he was functioning "normally," but that a "flareup of symptoms" would in all probability result from a "deviation from this routine." Accordingly, since it concluded that plaintiff was "incapacitated for further military service" despite the fact that "[i]n a restricted environment he is able to perform satisfactory work in civilian life," and, further, that his "disability has become permanent," it recommended that plaintiff "appear before a Physical Evaluation Board with a view to permanent disability retirement." This time the Medical Board's recommendation that plaintiff appear before a Physical Evaluation Board was approved and, on August 28, 1958, plaintiff did so appear (after, however, plaintiff had, in the latter part of July 1958 experienced another hemorrhage episode, which had lasted about two days). After a hearing, the Physical Evaluation Board too found plaintiff "physically unfit for further military service," again rating the disability 40 percent. However, the Board

---

5. One of defendant's own medical experts (Dr. Everett B. Cooper) testified at the trial that, in his opinion, based on a review of the medical records, plaintiff's condition was worse in 1955 after his Korean service than it was when he entered the service in 1953. (Tr., pp. 201, 212)

6. Despite the constriction, plaintiff's stomach had emptied without difficulty so that the Board concluded that plaintiff's ulcer condition was "without obstruction."

still felt that plaintiff should remain on the Temporary List and be reevaluated in a year (the Board's findings and recommendation being approved by the Army Review Council).

In the latter part of 1958, plaintiff experienced a disabling episode of hepatitis, the illness clearing up during the first half of 1959. However, it was followed by a period when his ulcer pain symptoms became particularly troublesome (apparently, however, without any hemorrhage episodes). Plaintiff was not able to return to his practice until around July 1, 1959, and then only on a basis of further reducing his previously restricted work-hour schedule by 50 percent, thereby cutting his practice in half.

On September 8, 1959, plaintiff underwent his third periodic physical examination, which included another X-ray series. At that time plaintiff, whether as a result of his reduced work schedule or otherwise, was feeling better, the ulcer then apparently being in a state of remission. However, the Medical Board again concluded that plaintiff was permanently disabled to a degree warranting disability compensation. Nevertheless, it recommended his continuation on the Temporary List,[7] which recommendation was adopted by the Adjutant General.

Following his third periodic examination, plaintiff found that, despite his continuing to maintain his 50 percent work schedule, his ulcer symptoms persisted. He suffered epigastric burning pains, for which medication was required and which, at times, interfered with his sleep.

Plaintiff's fourth and final periodic examination was conducted on February 24, 1960, only around five and one-half months after the previous one. The Medical Board, after reviewing plaintiff's history, including his symptoms and condition since his last examination, concluded that the previous diagnoses were still appropriate, that plaintiff's ulcer disability "persists," and, as had each of the three previous Medical Boards, that the disability had been "permanently aggravated by active duty." It recommended his appearance before a physical evaluation board.

After such Physical Evaluation Board proceedings, the Board, on March 24, 1960, found plaintiff to be "physically unfit for further military service by reason of" his ulcer. The disability was rated "moderately severe" ("without obstruction, but with history of hemorrhages"), carrying a rating of 40 percent.[8]

---

7. Although the "Proceedings" record stated that the ulcer condition had been "Permanently aggravated by active duty" (Joint Ex. 57, p. 4, Block 26), and that the "Degree" of plaintiff's "Disability For Military Service" was "Permanent" (id., Block 31), nevertheless, the "Clinical Abstract" attached thereto concluded with the "Recommendation" that plaintiff "be continued on TDRL [Temporary Disability Retired List] status," and the Board's final diagnosis, made October 8, 1959, stated that plaintiff's disability "may be permanent." (Joint Ex. 57, p. 1)

The disability was rated 30 percent by the Medical Board. As shown, plaintiff's net disability rating, after deducting the 10 percent that had been waived at the time he reentered service in 1953, was 30 percent. Previously, however, the disability had been specifically set forth as 40 percent, less 10 percent, making a net of 30 percent. The VA Schedule for Rating Disabilities contained no 30 percent rating for ulcer.

The X-rays again showed no obstruction, despite the same constriction in the duodenal bulb previously indicated. The radiologist's "Impression" was that the constriction represented "residual scarring * * * secondary to a healed duodenal ulcer." Obviously, however, the Board did not consider the fact that the radiologist referred to the ulcer as "healed" as indicating plaintiff's troubles were over since it still considered plaintiff to be permanently disabled to a degree warranting continuation of disability compensation. As previously indicated, the second Medical Board had concluded that plaintiff's ulcer was "chronic," but with "exacerbations and remissions."

8. However, the Board again deducted the 10 percent that had been waived, making a net total disability of 30 percent.

However, on May 3, 1960, plaintiff was advised by the Adjutant General that the Army Physical Review Council had, after reviewing the Physical Evaluation Board proceedings, recommended that "you be deemed physically fit for the performance of active military duty commensurate with your age and rank." There was no analysis of the evidence upon which the Review Council's conclusion and recommendation were based or any explanation or reasons given for the conclusion.

On June 7, 1960, plaintiff was advised by the Adjutant General that the Army Physical Disability Appeal Board had, following plaintiff's protest and rebuttal of the Review Council's recommendation, concurred in the Council's findings that plaintiff was physically fit for active duty. Again there was nothing in the way of an analysis of the evidence or any reasons given upon which such concurrence was based.

Following plaintiff's removal from the Temporary Disability Retired List on June 30, 1960, and his October 18, 1961, application to the Army Board for Correction of Military Records to correct his records to show that he was, on such date, permanently physically unfit for active duty, such Board sought an opinion from the Surgeon General. That office, on August 9, 1962, expressed the opinion that "there is no medical evidence that the applicant had an active duodenal ulcer at the time of separation," and that plaintiff was therefore "fit for active military service at the time of his separation." It thus concluded that there was no merit to plaintiff's "complaint of error or injustice in the medical aspects of his separation from the service." Again, however, there was no analysis of the evidence or reasons given upon which the conclusion was based.

In 1963 plaintiff, because of his ulcer condition, gave up the private practice of medicine. He then became a hospital resident experimenting in the field of artificial kidneys, and the following year became employed by a company making such kidneys. On this employment his work hours were substantially his own, his time being spent principally on research work and writing.

Thereafter, on December 16, 1964, the Correction Board held a hearing on plaintiff's application, at which plaintiff was the only witness. Following the hearing, the Board, on such date, recommended that plaintiff's application be denied. It concluded that, as of the date of his removal from the Temporary List, there was "no recorded, verified, or documented period of ulcer disease, to a degree to warrant a finding of unfitness for duty," and that during the five-year period he was on such list ,"there is no evidence of necessity for prolonged or frequent hospitalization, other than for periodic evaluation, unequivocal X-Ray findings of ulcer activity, objective and verified episodes of recurrent bleeding, or perforation or obstruction." It further found that the policy under which Special Registrants were inducted, despite disqualifying defects, "must be considered in final physical evaluation; otherwise, all Registrants inducted with such defects would be found unfit for duty at time of separation and retired for disability, without respect as to whether sufficient permanent aggravation of such condition was incurred during service to warrant retirement therefor."

This detailed review of the approximately five-year (September 1, 1955—June 30, 1960) period that plaintiff was on the list shows that up to May 3, 1960, there was complete unanimity by four Medical Boards (*i. e.*, twelve doctors), two Physical Evaluation Boards, and one Physical Review Council, that plaintiff was incapacitated to a degree warranting the continued receipt of disability retirement pay. Certainly no cure or marked improvement is indicated in this period which covered practically the entire time plaintiff was on the list. Nor were these conclusions the product of superficial consideration. They were based on four periodic physical examinations by Medical Boards, and at least two X-ray series. The Boards all concluded that plaintiff's disability was permanent and

that he was unfit for duty with a 40 percent rating. The X-rays showed a deformed and constricted (due to scarring) duodenal bulb. Allowing for short periods of remission (ulcer being typically an exacerbation-remission type of ailment), for the most part plaintiff's symptoms of pain (epigastric burning) persisted throughout the entire peirod. Hemorrhage had occurred at least twice during the period and plaintiff was on constant medication. At the beginning of the period he practiced medicine but, because of his need for rest and avoidance of undue strain, the practice was on a restricted basis. Commencing in 1959, however, which was in the latter part of his stay on the list, he found it necessary to cut even this restricted activity in half. After such a long history and consistent record of obviously well-grounded unanimous medical opinion, and after the fourth and final Medical Board's conclusion on February 24, 1960, that plaintiff's ulcer disability "persists" and had been "permanently aggravated by active duty" (all of which confirmed the diagnosis and conclusions of the third Medical Board proceedings just five and one-half months before), with such conclusion, on the basis of its own proceedings, being approved by the Physical Evaluation Board on March 24, 1960, how the Army Physical Review Council could, on the identical record, suddenly arrive at the diametrically opposite determination, i. e., that plaintiff was "physically fit for the performance of active military duty," simply cannot be understood. Nor can the mystery be solved by any explanation, based on an analysis of the evidence or otherwise, that is offered by the Council or by the Adjutant General in reporting the Council's decision to the plaintiff. For there is no such explanation or analysis. All that we have is the naked ultimate conclusion that plaintiff was "physically fit." Such a determination, "conclusionary in nature," making it impossible to "determine what weight was given to the evidence," and which does not "discuss the details or specify precisely what items of

evidence were considered," cannot be sustained. Smith v. United States, 168 Ct. Cl. 545, 552 (1964); accord, Cooper v. United States, 178 Ct.Cl. 277 (1967).

In Cooper too, also an ulcer disability case, the court, after observing that "nothing could be more natural than to accord greater weight to the opinions of the physicians who saw, heard, interviewed, and examined the patient than is given to the opinions of physicians who have reviewed a paper record only" (p. 311), noted that, as in the instant case, "[t]he determination that plaintiff was fit for duty was made by the Physical Review Council on the same evidence, presumably, that had persuaded two separate Physical Evaluation Boards to recommend a 40 percent rating, and on the basis of which an earlier Physical Review Council * * * " had also recommended a disability rating (pp. 314–315), and yet there was "no explanation in the evidence * * * as to how the Physical Review Council arrived at its determination." (p. 315)

> Without specific facts to explain the Physical Review Council's recommendation, efforts to appraise the reasoning upon which it was based or the motivation behind it would result only in speculation. The essential fact remains that the council's determination of fit for duty is not only lacking in support by substantial evidence; it is unsupported by any evidence whatever. The recommended finding must therefore be deemed to have been arbitrary, if not capricious. (Id., pp. 315–316)

Such "arbitration action by the Physical Review Council," the court held, "compromised the decisional process and deprived it of the integrity to which the plaintiff was entitled." (p. 316) It therefore invalidated the Secretary's final determination which too rejected the 40 percent rating recommended by the Physical Evaluation Boards, and gave judgment for plaintiff on the basis of such rating.

The only possible "explanation" plaintiff was then given for the finding that

he was "physically fit for the performance of active military duty commensurate with" his age and rank was the broad statement of the Adjutant General, in advising plaintiff of the Physical Review Council's action, that: "This finding is in accord with current Army medical standards of fitness and unfitness for retention on active duty. (Paragraph 1, AR 40–504 and physical standards for Special Registrants under Public Law 779)." However, the parenthetically referred to AR 40–504 is hardly enlightening as justification since Paragraph 55 thereof says that an active ulcer "may make the individual unfit"; that "[i]t is necessary to individualize in each case"; and that "[g]enerally an individual should be considered as unfit for service when symptoms persist to a severe degree following adequate medical treatment and when there is a history of frequent recurrences, obstruction, perforation or recurrent bleeding." Plaintiff's "symptoms" had certainly persisted "to a severe degree following adequate medical treatment," and plaintiff's case also showed "a history of frequent recurrences" and "recurrent bleeding," plaintiff having experienced, in addition to the three bleeding episodes prior to entry into the Army service, the numerous episodes he suffered in Army service, both in Korea (at 'least one in September 1953 and five during October 1954—January 1955), as well as thereafter in the States (two in February 1955, and two more while on the Temporary List (one in the summer of 1957 and one in July 1958)). Thus, there was nothing in this part of the Regulation which served to bar plaintiff's claim, and there is, as stated, no explanation of what the Council was relying on in the Regulation to effect such a bar.

Nor is the simple reference to the Rosenberg standards or policy any more enlightening. Indeed, the mere reference to such standards is inconsistent with the previous finding of physical fitness, for, as defendant concedes, the policy was directed to those who were admittedly unfit under the usual standards but whose disabilities, by the application of the waiver doctrine, could nevertheless be considered of such degree as not to prevent their being useful to the services.[9] The "use of a waiver in the original appointment * * * means that one is not fit for general service." Cosgriff v. United States, 737, 387 F.2d 390, 394, 181 Ct.Cl. 730 (1967). Thus the reference to the Rosenberg standards could rationally only mean that plaintiff's disability was no greater in 1960 than it was when he entered service in 1953 with the 10 percent disability. Although generally "[t]his court * * * does not seek to apply the standards for original appointment and for retention to the question of entitlement to disability retirement, since the standards for the two fields are entirely different," [10] nevertheless, if plaintiff's disability in 1960 was only 10 percent and thus no more than what it was when he reentered service in 1953, it seems clear that he would not be entitled to compensation. Indeed, this is defendant's present position for, although it now concedes that plaintiff was not physically fit (thus rejecting the findings to such effect by the Physical Review Council and the Physical Disability Appeal Board, which were in turn adopted by the Secretary), it nevertheless contends that his disability in 1960 did not exceed what it had been on entry into Army service in 1953. But the same hereinabove detailed review of the numerous 40 percent disability findings made while plaintiff was on the Temporary List, and the solid evidence on which they were based, which served to compel a rejection of the "physically fit" findings,

---

9. " * * * the only purpose of a waiver was to permit the Army to accept or retain in the service critically needed personnel who could not qualify physically for general service." Cosgriff v. United States, 387 F.2d 390, 394, 181 Ct.Cl. 730, 737 (1967).

10. Id., 387 F.2d at 394, 181 Ct.Cl. at 737. Procurement standards do not apply in full force to the different issue of retirement for physical disability. Grubin v. United States, 333 F.2d 861, 166 Ct.Cl. 272 (1964); Towell v. United States, 150 Ct.Cl. 422 (1960).

similarly served to compel a rejection of any 10 percent disability finding which may be deemed to be implicit in the Adjutant General's reference to the "physical standards for Special Registrants under Public Law 779." Of course, defendant's contention of a 10 percent disability in 1960 is based upon, and is only an extension of, its above-noted contention that when plaintif came out of the Army in 1955, he at that time too had only a 10 percent disability, a contention which, as shown, flies in the face of the Army's own well-grounded finding that plaintiff's disability had been aggravated to 40 percent.

Nor was the action taken, on plaintiff's appeal, by the Army Physical Disability Appeal Board any more meaningful. The only advice plaintiff received with respect thereto was that "[t]he Appeal Board concurred with the findings of the Review Council in that you are deemed physically fit for active duty." This time there was no reference at all, parenthetical or otherwise, to the Rosenberg standards, with the 10 percent disability inference that would be implicit in such reference. The Appeal Board apparently felt that this doctor who was, with constantly recurring pains, and with a considerable rest, diet, and medication regimen, conducting a private practice on a restricted, half-time basis, would be able, on a completely "physically fit" basis, to assume a full schedule of military duties as a physician, for the Adjutant General, in advising plaintiff of the Appeal Board's "physically fit" finding, enclosed an application which plaintiff could submit for "recall to extended active duty." The final "Army Special Orders" entered, by order of the Secretary of the Army, following the "final determination" of the Appeal Board, declared plaintiff "to be physically fit for active duty," a conclusion which, as stated, defendant itself now concedes was erroneous. The testimony of both of defendant's medical experts at the trial herein was to the effect that plaintiff was not (except for the

Rosenberg policy) physically fit for duty in 1960 when he was removed from the Temporary List.[11]

On the basis of the above considerations and analysis, plaintiff's inexplicable removal from the Temporary Disability Retired List on June 30, 1960, with the finding that he was then physically fit for active duty, must be considered to have constituted arbitrary and capricious action. McGiven v. United States, 183 Ct.Cl. 920 (1968). Cf. Brozik v. United States, 180 Ct.Cl. 546 (1967), where the court rejected an insufficiently explained ultimate fitness finding by an Army Physical Evaluation Board and Physical Review Council, resulting in removal from the Temporary Disability Retired List without further disability pay, such fitness finding being made in the face of previously consistent unfitness findings by four Medical Boards and a Physical Evaluation Board.

Nothing that has taken place in plaintiff's case subsequent to such June 30, 1960 removal serves to weaken this conclusion.

The Surgeon General's opinion of August 9, 1962, expressed to the Army Board for Correction of Military Records, again does not discuss or analyze any aspect of plaintiff's long medical history or otherwise indicate the basis for the conclusion "that there is no medical evidence that the applicant had an active duodenal ulcer at the time of separation and that he was unfit for active military service at the time of his separation." Such "superficial * * * cursory advice of the Surgeon General * * * couched in broad conclusions rather than a reasoned discussion of the evidence" is entitled to little weight. Dayley v. United States, 180 Ct.Cl. 1136, 1146 (1967). To the same effect is Lawler v. United States, 169 Ct.Cl. 644, 647 (1965).

The Board's own findings and conclusions of December 16, 1964, in which it stated that "it concurs in the opinion of the Surgeon General's Office," are little better. Other than plaintiff's own testi-

---

11. Dr. Henry W. Boyce, Jr., Tr., p. 176; Dr. Everett B. Cooper, Tr., pp. 200–04.

mony, the Board had no new evidence. It concluded (its finding No. 4) that, following plaintiff's placement on the Temporary List, "there is no evidence of necessity for prolonged or frequent hospitalization, other than for periodic evaluation, unequivocal X-Ray findings of ulcer activity, objective and verified episodes of recurrent bleeding, or perforation or obstruction." However, there is no indication that any regulation pertaining to ulcer cases made "prolonged or frequent hospitalization" a prerequisite to a finding of unfitness for duty. The above-mentioned and quoted AR 40–504, which sets forth the "Standards Of Fitness and Unfitness For Retention On Active Duty," did not. "Prolonged hospitalization" is only mentioned therein as one of four factors in connection with the question of aggravation of an ulcer which existed prior to entry on active duty, and relates to such hospitalization as having occurred "in the service." As shown there were valid aggravation findings made by the Army in 1955 when plaintiff was placed on the Temporary List. Nor is it evident what the Board meant by "unequivocal X-Ray findings of ulcer activity," or again what it was relying on in making such reference. As noted, the periodic examination X-rays that were taken while plaintiff was on the Temporary List (as well as the prior X-rays) showed a deformed and scarred duodenal bulb. Indeed, these X-rays were important factors in causing the Medical and Physical Evaluation Boards to conclude that plaintiff had a permanently disabling chronic doudenal ulcer. One of defendant's own medical experts at the trial testified that the "scarring of the duodenal bulb" shown by the X-rays taken while plaintiff was on the list "is indicative of some activity of his

ulcer disease." [12] Moreover, again the pertinent AR 40–504 (Paragraph 55) does not make X-rays of the type described by the Board a prerequisite to an unfitness finding, "X-ray evidence of an active ulcer" being mentioned therein only in the same "aggravation" portion as contained the reference to "prolonged hospitalization." [13] And the same considerations apply to the "objective and verified episodes of recurrent bleeding, or perforation or obstruction" portion of the Board's statement. This language too is essentially that of the "aggravation" portion of the Regulation. As noted, the portion of the Regulation here applicable simply says that "an individual should be considered as unfit for service when symptoms persist to a severe degree following adequate medical treatment and when there is a history of frequent recurrences, obstruction, perforation or recurrent bleeding." That plaintiff's frequently recurring symptoms persisted to such a degree as to cause a drastic curtailment of his medical practice by the time he was removed from the list is nowhere denied but not even mentioned by the Board, as well as the "recurrent bleeding," of which there were two occurrences while plaintiff was on the list.[14] Indeed, by the time plaintiff testified before the Board, he had given up his practice entirely to take up private employment involving essentially research and writing,[15] this severe limitation on his normal civilian pursuits also remaining unmentioned by the Board. Events subsequent to release are properly to be considered in making a determination of physical witness as to the release date. Walters v. United States, 358 F.2d 957, 962, 175 Ct.Cl. 215, 225 (1966); Harper v. United States, 310 F.2d 405, 408, 159 Ct.Cl. 135, 140–141 (1962). Thus, the

---

12. Dr. Cooper, Tr., p. 199.

13. "If the ulcer existed prior to entry on active duty, the ulcer will not be considered as permanently aggravated by the service unless one of the following conditions has occurred in the service: a. Obstruction, b. Perforation, c. Recurrent bleeding, or d. Persistent symptoms and X-ray evidence of an active

ulcer after prolonged hospitalization or medication and ulcer regime." Finding 54(c).

14. Findings 40, 42. Both of defendant's experts at the trial *erroneously referred* to only one bleeding incident while plaintiff was on the list.

15. Finding 58.

Board's basic conclusion (its finding No. 1) that upon plaintiff's removal from the list, there was "no recorded, verified, or documented period of ulcer disease, to a degree to warrant a finding of unfitness for duty" is, like the previous Physical Review Council's and Surgeon General's similar finding, not based on any reasoned analysis of the evidence, and similarly contradicts without any explanation the directly opposite conclusion arrived at by the four Medical and the two Physical Evaluation Boards. As was stated in Beckham v. United States, 392 F.2d 619, 622–623, 183 Ct.Cl. 628, 636 (1968):

> * * * there is no satisfactory showing on the record that the Board's determination was based upon a balanced consideration of all the evidence available and presented. A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing * * * is inimical to a rational system of administrative determination and ultimately inadequate.

No exception can be taken to the Board's conclusion (its finding No. 7) that the "policy" of "inducting Special Registrants who were considered to have disqualifying defects * * * must be considered in final physical evaluation; otherwise, all Registrants inducted with such defects would be found unfit for duty at time of separation and retired for disability, without respect as to whether sufficient permanent aggravation of such condition was incurred during service to warrant retirement therefor." (It should be observed, however, that if, by this "Conclusion" the Board was conceding that, in 1960, plaintiff was unfit, but not more so than when he was inducted in 1953, it should have said so, instead of flatly finding, inconsistently, that a finding of unfitness for duty was not then warranted.) But here the evidence that was presented to the Board was overwhelming that, as four Medical Boards, two Physical Evaluation Boards, and one Physical Review Council had found,

plaintiff's 1955 aggravated 40 percent disability condition had persisted throughout his period on the list and up to the time of his removal therefrom in 1960.

Nor do the trial proceedings conducted herein serve in any way to alter the conclusion that plaintiff should have been permanently retired upon his removal from the list in 1960. The only witnesses, in addition to plaintiff himself, were an expert medical witness offered by plaintiff and two such experts offered by defendant (none of the experts having examined plaintiff, but instead testifying only on the basis of the medical history as set forth in the quite voluminous records pertaining to plaintiff's case). Plaintiff's testimony indicated a continuation of his ulcer pain symptoms, manifesting themselves, on a quite constant basis, as a dull type of pain in the upper gastric region, and sometimes as much as twice a month, as sharp pains, such episodes lasting as long as ten days. More than usual quantities of work or tension are likely to bring on such episodes. He maintains an ulcer diet and medication regimen. At the time he testified he was unemployed. He had terminated the essentially research and writing employment he had when he testified before the Correction Board because of the traveling and irregular hours it sometimes required. Plaintiff's expert, a qualified specialist in internal medicine and gastroenterology (who had served in the Navy as a doctor and was familiar with service medical standards), concluded that plaintiff's condition was worse in 1960 than it had been in 1955 and that it would be a rare situation for anyone who had an ulcer as long as plaintiff did to become permanently healed, although there might be temporary remissions. He pointed out that a long history of exacerbations and remissions indicates that there is no permanent healing but that instead there is a basic underlying pathological process. He testified that hemorrhaging and obstruction are only individual factors in determining fitness for duty and that a proved ulcer,

without either obstruction or hemorrhaging, would be disabling. He concluded that a physician with an ulcer so severe that he could function on only a 50 percent medical practice basis in civilian life —which was plaintiff's situation in 1960 when he was suddenly declared by the Physical Review Council and the Disability Appeal Board to be physically fit for active duty—would certainly not be fit to function as a doctor in the military.

The testimony of one of defendant's experts [16] (also a qualified specialist in internal medicine and gastroneurology) was to the effect that, on the basis of hemorrhage frequency and absence of evidence of obstruction, there was in his opinion no significant difference between plaintiff's condition in 1953, when he returned to active duty, and 1960, when he was removed from the list. But clearly this places too great stress on the individual hemorrhage and obstruction factors. AR 40–504 places primary emphasis on the situation "when symptoms persist to a severe degree following adequate medical treatment and when there is a history of frequent recurrences * * *." "Obstruction, perforation or recurrent bleeding" are mentioned only as other factors to be taken into consideration.[17] That so much importance was not placed upon such an individual factor as obstruction while plaintiff was on the Temporary List is indicated by the fact that plaintiff was, for almost five years, retained on the list even though the evidence of obstruction which was indicated at the time he was first placed on the list thereafter no longer manifested itself.[18]

The Physical Evaluation Board's evaluation after plaintiff's final periodic examination was that of a moderately severe duodenal uncer, without obstruction, but with a history of hemorrhage, and rated 40 percent disabling. And as to the important symptoms factor, the witness admitted that in 1953 plaintiff was asymptomatic while in 1960 he was experiencing symptoms two or three times a week. It seems difficult indeed to conclude that plaintiff's condition in 1953 and 1960 was substantially the same when, in 1953, he was able to function normally as a physician on a full-time basis, without any significantly inhibitory symptoms (as he was also able to so function between the bleeding episodes in the 1945–1953 period), but in 1960 he was regularly experiencing incapacitating symptoms and could, therefore, only function on a restricted 50 percent basis, while observing, in addition, a strict rest, diet, and medication ulcer regimen, which the record makes plain was far from the situation in 1953. Furthermore, as to the hemorrhaging, upon which so much stress was placed, the witness construed the record to show only one bleeding incident while plaintiff was on the Temporary List, i. e., that which occurred in the summer of 1957, to which reference was made in the Medical Board proceedings on plaintiff's second periodic examination.[19] However, the witness appears to have missed a second bleeding incident which occurred in July 1958, to which plaintiff testified in his first Physical Evaluation Board proceeding a month later.[20]

---

16. Dr. Henry W. Boyce, Jr.

17. Finding 63(c). Furthermore, the VA Schedule for Rating Disabilities then applicable did not, for the 40 percent duodenal ulcer rating applied to plaintiff, mention either obstruction or bleeding. It merely provided:

"Moderately severe; with continuous manifestations of anemia, malnutrition and impairment of health or with recurring incapacitating episodes averaging 10 days in duration and occurring several times a year * * *."

In Cooper v. United States, 178 Ct.Cl. 277 (1967), the court awarded disability compensation for a duodenal ulcer condition which, unlike the plaintiff's situation herein, appears never to have been complicated by any obstruction or bleeding incidents.

18. Plaintiff's expert testified that obstruction in itself is subject to exacerbation and remission (Finding 63(b)).

19. Finding 41(a). It was this witness' opinion that plaintiff should not, even under the Rosenberg standards, have been considered fit for duty in 1953.

20. Finding 43(a).

Defendant's second witness, a well-qualified expert in internal medicine, also felt plaintiff's condition in 1953 and 1960 to have been substantially similar. However, this opinion was based upon the supposition that plaintiff's ulcer was "active" at both times.[21] But here too insignificant consideration was plainly given to the fact that, although technically the ulcer may be said to have been "active" in 1953 when plaintiff was inducted, it was nevertheless asymptomatic at such time, whereas, as the expert himself noted, in 1960 plaintiff's symptoms of pain were occurring two or three times a week.[22] Nor, apparently, did he give any consideration to the fact that, when plaintiff was inducted in 1953, his activities do not appear in any significant way to have been inhibited by his asymptomatic ulcer (which was further demonstrated by his arduous, long-hours' work schedules in Korea, during which he was "called many times during the night in medical emergencies,"[23]) while in 1960 he was able to operate only on a sharply restricted half-time basis. And, although this witness too, contrary to AR 40–504, appeared to place more stress on the individual obstruction and hemorrhage factors than on the basic symptomatology, he too pointed to only one bleeding incident while plaintiff was on the list, although, as noted, the record indicates that there were two.

For all of the above reasons, the conclusion is compelled that at the time of his removal from the Temporary Disability Retired List on June 30, 1960, plaintiff was not physically fit to perform active military duty commensurate with his age and rank. The 40 percent disability for which plaintiff had been carried on the list since September 1, 1955, and which was reaffirmed by the Physical Evaluation Board's finding of March 24, 1960, still existed on June 30, 1960, and should, under the provisions of Section 402 of the Career Compensation Act, have been considered to be of a permanent nature. Accordingly, such Physical Evaluation Board's 40 percent disability finding stands "unimpaired," McGiven v. United States, supra, 183 Ct.Cl. at 938, and properly forms the basis for judgment herein. McGiven v. United States, supra; Cooper v. United States, supra. Plaintiff should have been retired as of such June 30, 1960 date with disability pay based upon such 40 percent disability rating.[24] Judgment to such effect should be granted, the amount due to be determined in further proceedings under Rule 47(c).*

21. Tr., p. 198.

22. Finding 63(d).

23. Finding 27(b).

24. Although plaintiff's disability was, while he was on the Temporary List, rated 40 percent under the Veterans Administration Schedule for Rating Disabilities (finding 62), defendant decided to deduct 10 percent, representing his rated disability at the time of "entry into service" as determined by the Veterans Administration, making a net disability rating of 30 percent instead of 40 percent, his pay being based on such 30 percent basis (findings 35, 36). There appears, however, to have been no warrant for such 10 percent deduction since such 10 percent disability was service-incurred. Beckham v. United States, 392 F.2d 619, 183 Ct.Cl. 628 (1968). Paragraph 21(c) of AR 600–140, dated October 28, 1958, which was in effect when plaintiff was removed from the list, provided that a disability incurred during one period of service which recurs or is aggravated during a subsequent period, is, regardless of the intervening time, presumed to have recurred or to have been aggravated in line of duty. Finding 53(a). Defendant concedes that there is no disability in this case that can properly be considered as noncompensable due to the fact that it existed prior to service, the references by the Army to plaintiff's disability being "EPTS" (existing prior to service) referring only to plaintiff's service as an officer. (Finding 64(b))

* See judgment entered for plaintiff in the sum of $18,034.46 based on the stipulation of the parties in the court's *per curiam* opinion.